FRANKLIN DISCOUNT COMPANY, A CORPORATION OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. HAROLD C. FORD, T/A HARRY FORD AUTO SALES, *ET AL.*, DEFENDANTS-APPELLANTS.

Argued May 19 and 20, 1958—Decided June 25, 1958.

474

476

*Mr. Leon Sachs* argued the cause for the defendants-appellants (*Mr. Raymond F. Brady,* of counsel and on the brief).

*Mr. Edward R. McGlynn* argued the cause for the plaintiff-respondent (*Mr. Roger H. McGlynn* on the brief; *Messrs. McGlynn, Stein & McGlynn,* attorneys).

The opinion of the court was delivered by

BURLING, J. This is an action based upon ten promissory notes. The plaintiff, Franklin Discount Company, is the payee of each of the notes, the defendant Harold C. Ford is the maker. Each note bears two accommodation endorsements, one by the defendant Margaret Ford, wife of the said Harold C. Ford, and an endorsement by one of the other nine defendants in the suit. The tenth endorser is without this jurisdiction.

The case was tried in the Superior Court, Law Division, by a judge and jury. The jury returned a verdict of $19,401.97 in favor of plaintiff and against the defendants, Harold C. Ford and Margaret Ford, and a verdict of no cause of action in favor of the other nine defendants. Upon motion the trial judge set aside the verdict in favor of the nine defendant-endorsers, and entered judgment in favor of the plaintiff against each of the nine defendants in the amount of $1,933.43, with interest from October 14, 1955. The nine defendant-endorsers appealed. Prior to hearing

in the Superior Court, Appellate Division, we certified the cause on our own motion.

The trial below was the second trial of this case, a previous jury verdict in favor of the defendants having been set aside by the trial court.

The facts are lengthy and the essential ones are in dispute. The defendant Harold C. Ford was a retail automobile dealer. He purchased automobiles for resale from a finance company, Seth Boyden, which was owned by Richard Glassner, an attorney. On or about June 30, 1955 Seth Boyden referred Ford to the plaintiff. The plaintiff's transactions with Ford were of two types, one referred to as a "floor plan scheme" and the other as a "time sales operation." Under the "floor plan scheme" Ford would purchase an automobile, deposit the certificate of title with the plaintiff as security and at ·the same time sign a chattel mortgage and note securing the payment of the moneys advanced by the plaintiff. When a purchaser for the automobile was found, Ford would return to the plaintiff, tender a check or cash, and receive the certificate of title so that a transfer of title to the purchaser could be effectuated. Under the "time sales operation," when a customer was desirous of financing an automobile, Ford would obtain a credit application from the customer and forward it to plaintiff. Upon approval of the application by plaintiff, Ford would obtain the customer's signature on a note and conditional sales contract for the unpaid balance and assign the contract and note to the plaintiff, receiving a check in return. The president of the plaintiff, one Schwartz, testified that most of the transactions with Ford were of the "floor plan scheme."

In August of 1955 Ford encountered financial difficulties in the operation of his business which in turn gave rise to the instant series of notes. During a period from August 9, 1955 until August 16, 1955 Ford gave a series of checks to the plaintiff and plaintiff turned over to Ford the certificates of title for 18 cars. These checks were all returned for insufficient funds, the total of the checks plus protest fees

being $33,883.50. Immediately upon learning of the fact that there were not sufficient funds to cover the checks the plaintiff dispatched its employees to Ford's premises to pick up any cars upon which it had a lien. Four cars of the 18 were repossessed and later sold by the plaintiff, the amount received being credited to Ford's account. In addition Ford gave the plaintiff $4,000 in cash, which was also credited to his account. According to the figures on the company's account books, which were introduced into evidence, Ford's indebtedness to the plaintiff after subtracting total credits of $14,219.50 amounted to $19,664. While this amount was disputed by Ford, he could introduce no records or other evidence to substantiate his testimony that his total indebtedness was "in the vicinity of $6,300."

Richard Glassner, the owner of Seth Boyden, testified that Ford was also indebted to his company for $20,880.

On August 22, 1955 a meeting was held among Ford, Schwartz representing the plaintiff, and Glassner representing Seth Boyden. A material dispute developed at the trial concerning what occurred at this conference. Glassner testified that Schwartz was adamant about getting his money and that he threatened to prosecute Ford if the money was not immediately forthcoming. He further testified that, after repeated urging, he finally prevailed upon Schwartz to accept a suggestion made by Ford that Ford obtain ten endorsers to lend their credit to a note, payable over a period of five years, if Schwartz would forbear from suit on the indebtedness. Two notes were drawn by Glassner in the face amount of $19,663.20 and $20,880 representing Ford's indebtedness to the plaintiff and Seth Boyden, respectively. According to Glassner an agreement was also drawn up providing, in substance, that Ford was to execute promissory notes to each creditor in exchange for their forbearance from enforcing their claims against Ford. This written agreement, the existence of which was disputed by Ford, was completely unexecuted. In any event, the signatures of the proposed endorsers of the two notes were never secured for the reason

that each endorser did not want to be liable for the large face amount of the notes.

Ford's version of the conference of August 22, 1955 was quite different. His testimony was to the effect that he was told that if he could procure ten endorsers who would lend their credit to promissory notes, that he would be given a new line of credit and that he would be able to remain in business. Ford insisted that the consideration for the notes and endorsements was not a forbearance from suit on the old debt, but the extension of a completely new line of credit by plaintiff.

After the conference Ford and one Freeman, an attorney and associate in Glassner's office, attempted to procure the endorsements on the beforementioned two notes. When that attempt ended in failure Ford and Freeman returned to Glassner's office. Glassner devised a new plan, designed to obviate the reluctance of the endorsers to sign the large notes. Glassner dictated, and his secretary prepared, a series of ten notes payable to the plaintiff in the face amount of $1,966.20 each, and ten notes payable to Seth Boyden in the face amount of $2,088 each. Thus each endorser would only be liable for 1/10th of the face amount of the notes upon which endorsements were originally sought.

Again Ford and Freeman set out to procure the various endorsements. There is some conflict in the testimony as to the authority possessed by Freeman. Freeman testified that his only authority was to witness the signatures of the endorsers in order to assure their genuineness. Ford's testimony was to the effect that Freeman's role was not so passive, but rather that he was authorized by Glassner to secure the signature of the ten guarantors. The ten notes in question are identical in form. All were executed on September 14, 1955, each bearing the signature of Ford as maker, his wife as endorser, and one of the appellants as co-endorser. Ford's wife and the co-endorser signed each note twice, once at the top and once at the bottom of the back. The following is a sample of the notes:

## Face of Note

(Printed matter is enclosed in brackets—remainder is typewritten)

(Date:) September 14, 1955 (In the installments set forth on the reverse side hereof, I/We promise

(Amount $ ) 1,966.20 to pay to the order of)

FRANKLIN DISCOUNT COMPANY

*THE SUM OF 1966 DOLS 20 CTS _____ (Dollars)

(Payable at 1025 Broad Street, Newark 2, N. J.

(If any of the installments is not paid when the same becomes due, the entire unpaid amount of this note shall, without notice, become due and payable forthwith.

(In the event of default, the obligors agree to pay interest at 2% per month from date of default and, if placed with attorney for collection, additional 15% attorney's collection charge.

(Trial by jury and the right thereto are hereby waived.)

The alteration of the foregoing place of payment is O. K.

(Value Received) without interest HARRY FORD AUTO SALES

By_____ Prop.
 Harold C. Ford

* Stamped by checkwriter machine.

## Reverse Side or Back of Note

(Printed matter is enclosed in brackets—remainder is typewritten)

(ENDORSEMENT)

With waiver of presentment, demand, notice of dishonor and protest by all the undersigned.

Margaret Ford
32 Meadow Drive
Little Falls, N. J.

James E. Reynolds, Jr.
366 Hartford Road
South Orange, N. J.

(SCHEDULE OF PAYMENTS)

(The installments referred to on the reverse side hereof shall be) sixty (in number and payable one on the same day of each successive) month (hereafter as the day of the date hereof. The) said (installments shall be in the amount of $ ) 32.77 (each. This note was endorsed by the undersigned to induce the payee to forbear the enforcement of its past due claim against the maker and to grant the extension in the manner set forth in the within note and nine other similar notes, this note representing 1/10th of said indebtedness.

Margaret Ford

James E. Reynolds, Jr.

There is a complete contradiction in the evidence concerning what transpired during the procurement of the various endorsements. Ford and the appellants testified in substance as follows: That Freeman assured them at the time their signatures as endorsers were procured that the purpose of the note was to obtain a new line of credit for Ford in order to enable him to get back in or continue in business. Their unanimous testimony also was that the eight typewritten lines above the last signature, purporting to recite the consideration for the note, were not on the note at the time that they endorsed it. Ford made one monthly payment on the ten notes of $32.77 each and thereafter refused to make further payments for the alleged reason that an additional line of credit was not forthcoming from plaintiff. Each of the endorsers refused to make any payments for the same reason. The defenses of the appellants were: (a) a subsequent material alteration of the note, and (b) either a failure of consideration or a conditional delivery, the condition not being made.

Yetta Blank, who prepared the notes for Glassner, testified that she had typed the eight typewritten lines on the back of the notes at the time she was preparing the notes for execution. Her testimony further was that she had typed the clause *prior* to inserting the notes in a checkwriting

machine or protectograph which impressed the amount of the note on the face. The checkwriting machine does not print the amount on the note, but rather stamps or impresses it, resulting in a raising up or semi-perforation on the back.

The plaintiff called as witnesses two experts on questioned documents. These experts performed two types of tests on the notes which led them to the conclusion that the eight typewritten lines were on the note at the time the note was prepared for execution, and therefore at the time the endorsers placed their signatures thereon. The first test is denominated the "plate test." This consists of placing a glass measure showing lines to the inch (vertically and horizontally) over the note and then photographing the note and enlarging the photograph. The purpose of the test was to demonstrate the exact alignment of the type, both vertically and horizontally. The conclusion drawn from the test was that the typewritten letters on the note were in alignment. One of the experts testified that it would be "extremely difficult, if not impossible, on any one document to get the vertical alignment proper and get these lines parallel" after a note had once been removed from the typewriter and then reinserted. His conclusion was buttressed by the added factor "that this would have to have been done not once but nine times to complete these notes." Moreover, it was explained that:

"We have not only the problem of adjusting the original copy, which is, as I have described, a very difficult thing to do to get the vertical alignment right and to get the lines parallel, but we have the second thing, and that is to get the carbon copy in exact register with the original. Now, one might do that where there is no carbon paper in between by holding them up to a strong light and adjusting them that way, but then there is the problem of getting carbon paper between. The paper is black and it is not possible to transmit light to adjust them. Therefore, the only way they could be put back together would be purely by chance, and consequently when I found, as I will demonstrate from this exhibit—and it's true of all the carbon copies—that the alignment in the carbon copy was proper just the way it would be if these were put in the machine and typewritten all the way through, I had to conclude then that the carbon copies had been typewritten in a continuous typing operation, that you are

just taking and creating just an improbable situation to have reinserted one of these and gotten it in perfect register and then got it adjusted so that you get these lines absolutely parallel, which they are. * * *"

The second test performed was to examine microscopically the back of the note (in order to illustrate his conclusions the expert had photographic enlargements of portions of the note made). Part of the impression made by the checkwriting machine covered the area on the back where the disputed typewritten lines were. As previously explained the checkwriting machine does not merely print, but impresses or embosses the paper and gives it a "roughness" apparent to the "naked eye." Microscopic examination demonstrated by photographic enlargements indicated breaks or ridges in the typewriting. It was opined that if the eight typewritten lines had been placed upon the notes after the note had been placed in the checkwriting machine, the impact of the typewriter keys would have flattened the breaks or ridges when coming in contact with them. Nonetheless, the endorsers denied that the eight lines appeared on the note at the time they endorsed.

After default by Ford the plaintiff commenced suit against Ford, his wife and nine of the ten endorsers (as previously stated, the tenth endorser was without the jurisdiction). The action was tried before a judge and jury and the jury returned a verdict in favor of all defendants. The court submitted written interrogatories to the jury requiring them to respond in writing to the question of whether the inducement for the endorsements was a representation to the endorsers that a new line of credit would be extended to Ford, and the jury's reply was "yes." The further interrogatory was propounded inquiring as to whether the eight typewritten lines were placed on the note before or after the endorsements were executed and the jury's reply was "after." Thereafter the trial court set aside the verdicts of the jury as contrary to the weight of the evidence and ordered a new trial. Cross-applications for leave to appeal the trial court's action were denied by the Superior Court, Appellate Division.

At the retrial below the plaintiff made a motion to have the case tried without a jury, relying upon the waiver of jury trial appearing on the note. This motion was denied. In addition the plaintiff made a motion to excise the disputed eight typewritten lines on the back of the note prior to introducing the notes in evidence. This motion was also denied.

At the instant trial, the trial court set aside the verdicts of no cause of action against the nine endorsers rendered by the jury and directed that a judgment be entered in favor of the plaintiff and against the endorsers. The court in its opinion stated:

"A fair weighing of the evidence indubitably supports the conclusion that the '8' typewritten lines existed before and were not produced after the several endorsements. Furthermore, all denial of that evidence is limited solely to the testimony of the endorsing defendants (who appeared) and is otherwise unsupported.

No contradicting expert evidence is proffered. * * *

Although a jury might rightfully weigh the credibility of expert testimony and is not bound to accept its conclusiveness, the jury in this case, where, as here, the evidence was clear and demonstrative of correctness was not privileged to disregard it. The evidential weight of qualified expert knowledge was not credibly disputed and every plausible conclusion sustained the opinion expressed.

\* \* \* \* \* \* \* \*

In view of the foregoing conclusion that the jury verdicts of 'no cause' should be set aside, it of necessity follows that the 'law of the case' is thereby established, to wit, that the record proof contains no probable doubt under which reasonable men deliberating upon the proof, inclusive of all logical inferences deductible therefrom, in good faith, could differ in reaching determination that the several endorsing defendants are liable to the plaintiff under the cause pleaded."

 The first issue raised is whether, under any theory, the judgment entered by the trial court for the plaintiff may be upheld on appeal. It should first be noted that unlike the federal practice (Rule 50b) our rules make no provision for entry of judgment by the trial court notwithstanding the verdict of the jury. *Mazzietelle v. Belleville Nutley Buick Co.*, 46 N. J. Super. 410 (*App. Div.* 1957); *Clapp, "Federal Rules and New Jersey Practice,"* 16 F. R. D.

39, 65 (1954); *cf. Mortgage Corp. of New Jersey v. Aetna Cas. & Surety Co.,* 19 *N. J.* 30, 41 (1955). *Cf.* proposed amendment *R. R.* 4:51–2, *Supreme Court Rules Committee Report,* 81 *N. J. L. J.* 153, 160 (1958). The trial court, by entering such judgment, clearly exceeded the corrective powers over the jury's verdict granted it by the rules of court. Under the present practice in this State, the limit of the trial court's power after rendition of the jury's verdict is to set the verdict aside and order a new trial. *R. R.* 4:61. While the corrective power of entering judgment cannot be exercised by the trial court, the appellate court may, where motion for judgment was erroneously denied below, in its discretion, enter the appropriate judgment. *Mortgage Corp. of New Jersey v. Aetna Cas. & Surety Co., supra.* See also *Rospond v. Decker,* 109 *N. J. L.* 458 (*E. & A.* 1932); *George Siegler Co. v. Norton,* 8 *N. J.* 374 (1952); *Jaroszewski v. Central Railroad Co., New Jersey,* 9 *N. J.* 231 (1952); *Miller v. Board of Chosen Freeholders of Hudson County,* 10 *N. J.* 398 (1952); *Schnitzer, "Civil Practice and Procedure,"* 8 *Rutgers L. Rev.* 272, 287 (1953); Schnitzer, "Civil Practice and Procedure," 11 *Rutgers L. Rev.* 363, 376 (1956).

Thus, we are led to the question of whether the trial court should, upon plaintiff's motion at the close of the proofs, have directed a verdict in its favor.

The standard for determining when a motion for judgment should be granted at the close of the proofs in a jury case may be stated as follows: Where the judge, by the application of the reasoning processes of the mind to the evidence adduced in the case, may properly conclude that fair-minded men cannot honestly differ as to the conclusions to be drawn from the proofs, the motion for judgment should be granted. *O'Donnell v. Asplundh Tree Expert Co.,* 13 *N. J.* 319, 328 (1953); *Gentile v. Public Service Coordinated Transport,* 12 *N. J. Super.* 45, 50 (*App. Div.* 1951); 5 *Moore, Federal Practice* (2nd ed. 1951), § 50.02(1), p. 2314; *cf. Ferdinand v. Agricultural Ins. Co. of Watertown, N. Y.,* 22 *N. J.* 482 (1956). See also *Blume, "Origin*

*and Development of the Directed Verdict,"* 48 *Mich. L. Rev.* 555 (1950).

Where the opponent of the motion for judgment has introduced substantial competent evidence "the trial court cannot weigh the evidence but must accept as true all evidence which supports the view of the party against whom the motion is made and must give him the benefit of all legitimate inferences which are to be drawn therefrom in his favor." *Melone v. Jersey Central Power & Light Co.,* 18 *N. J.* 163, at *page* 170 (1955).

A recent federal decision has stated the standard in a different fashion, but the result is the same: *Burcham v. J. P. Stevens & Co., Inc.,* 209 *F. 2d* 35, 38 (4 *Cir.* 1954), in which the court states the test as follows:

"Where there is a determinative fact in a case which is either admitted or established by evidence so conclusive that reasonable men could entertain no doubt with regard to it, the court should, of course, direct a verdict as a matter of law."

The determinative facts in the instant case, *i. e.,* whether the eight typewritten lines were on the note at the time the endorsers signed and, if not, whether the parties understood that a condition precedent to liability on the note would be the extension of a new line of credit by the plaintiff to Ford, were vigorously disputed.

The plaintiff contends, however, that the evidence adduced on its behalf is conclusive and that therefore it was entitled to a verdict in its favor at the close of the proofs. It alleges that the notes are demonstrative evidence, apparent to the "naked eye," of the physical fact that the eight typewritten lines appeared thereon at the time the defendants endorsed them and further, that the demonstrative evidence renders the defendants' denial "inherently improbable or '\* \* \* inconsistent with the common principles by which the conduct of mankind is naturally governed'." *Fitzpatrick v. Merchants & Manufacturers Fire Ins. Co.,* 122 *N. J. L.* 468, 472 (*E. & A.* 1939). The contention is that "credibility of witnesses and the weight to be given the evidence is not involved as it would be were it not for the physical facts

and demonstrative evidence present" and that "if a physical fact conclusively establishes that a defense is ill-founded and has no basis in fact or reason, regardless of a person's testimony, the matter is for the court and not the jury."

In our view the plaintiff's autoptic proference does not, in and of itself, establish the physical fact contended for. The untutored observer need not necessarily (indeed, probably cannot) by examining the notes with the "naked eye" conclude that the questioned typewriting was on the notes at the time the endorsers signed. Rather, any conclusive weight to be given the autoptic proference must rest upon an examination of the original notes (and enlargements thereof submitted at the trial) in light of the conclusions of the questioned documents experts. The experts based their conclusions upon the "plate" tests indicating proper alignment, the fact that such alignment of the typewritten letters would be extremely difficult to achieve if the notes were later reinserted into the typewriter, and the further fact that the impressions made upon the typewritten letters on the back of the note by checkwriter stamping indicate that the typewriting was put on before the check was inserted in the checkwriting machine. The ultimate conclusion concerning the alteration is not evidenced by the notes themselves, but by the notes (and enlargements thereof) viewed in the light of the experts' opinion.

The credibility of the expert's conclusions is essential to the plaintiff's view of this case. And it is elementary that the credibility of expert testimony is within the province of the jury. See e. g., *State v. Cerciello*, 86 N. J. L. 309, 314 (*E. & A.* 1914) ; 5 *Moore, supra, p.* 2315. *Cf. Ferdinand v. Agricultural Ins. Co. of Watertown, N. Y., supra.*

For the foregoing reasons the refusal of the trial court to enter a judgment in the plaintiff's favor at the conclusion of the proofs was proper. But even though the trial court was correct in denying the plaintiff's motion for judgment at the close of the case, the court was justified in setting aside the jury's verdict as contrary to the weight of the evidence.

490

A verdict may properly be set aside as contrary to the weight of the evidence, even though the state of the evidence would not justify the direction of a verdict at the close of the proofs. 5 *Moore, supra,* § 50.03; 9 *Wigmore, Evidence* (*3d ed.* 1940), § 2495, *p.* 298. The difference between the applicable standards controlling the two forms of corrective relief is set forth by Judge Lurton in *Mt. Adams & E. P. Inclined R. Co. v. Lowery,* 74 *F.* 463, 476 (6 *Cir.* 1896), quoted with approval in *Adams v. United States,* 116 *F. 2d* 199, 202 (7 *Cir.* 1940):

"* * * there is a difference between the legal discretion of the court to set aside a verdict as against the weight of evidence, and that obligation which the court has to withdraw a case from the jury, or direct a verdict, for insufficiency of evidence. In the latter case, it must be so insufficient in fact as to be insufficient in law; in the former case it is merely insufficient in fact, and it may be either insufficient in law, or may have more weight, and not enough to justify the court, in exercising the control which the law gives it to prevent unjust verdicts, to allow a verdict to stand. * * * We do not think, therefore, that it is a proper test of whether the court should direct a verdict, that the court, on weighing the evidence, would, upon motion, grant a new trial. A judge might, under some circumstances, grant one new trial and refuse a second, or grant a second and refuse a third. In passing upon such motions he is necessarily required to weigh the evidence, that he may determine whether the verdict was one which might reasonably have been reached. But, in passing upon a motion to direct a verdict, his functions are altogether different. In the latter case we think he cannot properly undertake to weigh the evidence. His duty is to take that view of the evidence most favorable to the party against whom it is moved to direct a verdict, and from that evidence, and the inferences reasonably and justifiably to be drawn therefrom, determine whether or not, under the law, a verdict might be found for the party having the onus."

Upon motion for a new trial the trial judge must weigh the evidence, and if it be so overwhelming on one side "as to give rise to the inescapable conclusion of mistake, passion, prejudice, or partiality, it cannot serve to support the judgment." *Hager v. Weber,* 7 *N. J.* 201, 210 (1951). See also *Annichiarico v. Mobilite, Inc.,* 19 *N. J. Super.* 492 (*App. Div.* 1952).

The uncontradicted expert testimony, although not conclusive, along with all of the other facts and circumstances in the case, justified the trial court's action in setting aside the jury's verdict on the ground that it was contrary to the weight of the evidence.

There is no set limit to the number of retrials which may be had. The decision rests in the sound and reasoned discretion of the trial court. *Mead v. Wiley Methodist Episcopal Church,* 23 *N. J. Super.* 342 (*App. Div.* 1952); Schnitzer, *supra,* 8 *Rutgers L. Rev.,* at *p.* 276.

The plaintiff contends that the trial court erred in denying its motion for a non-jury trial. Its argument further is that since the jury should not have been there in the first instance the action of the court below should be measured by the standard applicable where the judge is a trier of the fact. Plaintiff urges that a finding by the trial court that the verdict is contrary to the weight of the evidence must *a fortiori* include a finding that the preponderance of the evidence rests with the plaintiff, thus rendering the trial court's action harmless error.

We are without jurisdiction to decide the question. Plaintiff's theory is predicated upon the fact that the trial court erroneously denied its motion for a non-jury trial. The plaintiff has not cross-appealed from the judgment below and we have held that a party, in order to attack the actions below which were adverse to him, must pursue a cross-appeal. *Liberty Title & Trust Co. v. Plews,* 6 *N. J.* 28, 45 (1950); *R. R.* 1:2–6. For the foregoing reason a new trial is necessary.

We proceed to dispose of the question of whether at the new trial the plaintiff may reassert his right that it be a non-jury trial. The defendants assert that since the plaintiff waived his right to a non-jury trial in the first trial, he cannot, on a retrial of the cause, assert that right, citing *Lerner v. McDermott,* 11 *N. J. Misc.* 99 (*Sup. Ct.* 1933); *Friedman v. Steinhauser,* 13 *N. J. Misc.* 601 (*Sup. Ct.* 1935), which hold that a litigant's failure to make a timely demand for trial by jury bars his right "not merely for the first trial, but for all steps taken in the litigation

up to final judgment, including subsequent trials, if any." *Cf. R. R.* 4:39–1. The federal practice is apparently in accord with these decisions, see 5 *Moore, supra,* 342, but *cf. Burnham v. North Chicago St. Ry. Co.,* 88 *F.* 627 (*7 Cir.* 1898); *Northern Pac. Ry. Co. v. Van Dusen Harrington Co.,* 34 *F. 2d* 786 (*D. C. Minn.* 1929). But the weight of authority is *contra.* See *Bliss v. California Co-operative Producers,* 112 *Cal. App.* 507, 247 *P. 2d* 85 (*Dist. Ct. App.* 1952); *Nedrow v. Michigan-Wisconsin Pipe Line Co.,* 70 *N. W. 2d* 843 (*Iowa Sup. Ct.* 1955); *Lefkowitz v. Resnick,* 196 *Misc.* 661, 92 *N. Y. S. 2d* 441 (*Sup. Ct.* 1949); 50 *C. J. S. Juries* § 111, *p.* 824; *Annotation,* 106 *A. L. R.* 203, 205 (1935).

The above cited authorities deal with *procedural* waivers of the constitutional right to trial by jury. The instant case is readily distinguishable since we are concerned with the plaintiff's correlative right to a non-jury trial arising from a *contractual* waiver by the defendants.

 Where a new trial has been granted "the case stands as if there had never been a trial; the court has the same power with reference to matters connected with the trial of the case as it had before the first trial was had, and it is the duty of the court to proceed as in the first instance. The new trial is had as if there had never been a previous one." *Kimble v. Degenring,* 116 *N. J. L.* 602, 603–604 (*Sup. Ct.* 1936). See also *Miller v. Linde,* 33 *N. J. Super.* 41 (*App. Div.* 1954); *cf. R. R.* 4:39–1. New claims and defenses may be asserted in the subsequent trial. *Balhke v. Traverse City,* 308 *Mich.* 1, 13 *N. W. 2d* 184 (*Sup. Ct.* 1944); *Rilzheimer v. Marshall,* 168 *S. W. 2d* 159, 166 (*Mo. Ct. App.* 1943), 39 *Am. Jur., New Trial,* § 218; 66 *C. J. S. New Trial,* § 230.

Plaintiff's contractual right to a non-jury trial is an affirmative right which may be asserted at the subsequent trial. Failure by counsel to demand the constitutional procedural right to trial by jury in an appropriate case is rarely inadvertent, whereas the failure to assert a contractual right to a non-jury trial may well be the result of an oversight

by counsel as is asserted in the present case. There is no sound reason why the contractual right cannot on the subsequent retrial of the instant cause be asserted as a defense to a demand for a jury trial.

The plaintiff further contends that the defendants' proofs did not establish a principal-agency relationship between the plaintiff and Freeman. It asserts that Freeman "was an agent with authority to witness signatures only" and that "As such, Freeman was a mere automaton, similar to an agent for collection or delivery."

The plaintiff argues that Freeman was a special agent whose sole function was limited to witnessing the signatures and that third parties dealing with a special agent are bound by the doctrine of *caveat emptor* to make inquiries of the principal. See *Scherer v. Post Office Building and Loan Association,* 91 *N. J. L.* 666 (*E. & A.* 1917); *Markowitz v. Berg,* 125 *N. J. Eq.* 56 (*Ch.* 1939), affirmed 127 *N. J. Eq.* 90 (*E. & A.* 1940).

Moreover, it is asserted that Schwartz knew nothing of the subsequent arrangement to execute a series of ten notes and hence cannot be bound by any representations of. Freeman as to the purpose of the endorsements.

The evidence relating to Freeman's actual authority is sparse. Ford testified as follows:

"Q. And what arrangements were made for the execution of these notes? A. Mr. Freeman was going to accompany me, inasmuch as he is also a notary public, and secure the signatures of the ten guarantors and witness the signatures of them as they signed the notes."

Thus, the jury may have concluded that Freeman was more than a "traveling notary," and that he was to assist Ford in securing the signatures. Even if Freeman is considered a "special agent" (a term which is distinguished from a general agent only in degree, see *Mechem, Outlines of Agency* (*3rd ed.* 1923), § 26), it would seem that if, in order to secure an endorser's signature he was required to answer a question concerning *why* the note was given, his response

would be within his general powers. See *Seavey, Studies in Agency* 94 (1949). Moreover, since the plaintiff seeks the advantage of the endorsement so procured, he cannot be heard to complain of the misrepresentations. See *Restatement, Agency,* § 259 (1933); *MacLeod v. Ajax Distributing Co.,* 22 *N. J. Super.* 121, 127 (*App. Div.* 1952).

Lastly, the plaintiff contends that the eight lines do not constitute a material alteration within the intendment of the Negotiable Instruments Law, *R. S.* 7:2–125. "It is plaintiff's position that when each endorser signed at the top of the back of each note, *i. e.,* the first endorsement, he *then and there* became a general endorser and liable as such, regardless of the remaining portions of the note, whatever else may have been written following the first endorsement, or the number of endorsements thereon. The legal obligation of each of the defendants *became fixed* as of the moment of their endorsement, and the typewritten portion, which defendants allege was added, does not add to or take away in any manner the legal efficacy of their endorsement. Their second endorsement is merely duplicitous and surplusage. Legally it does not mean a thing." This argument is without merit. An endorsement need not be on any particular part of the instrument, *R. S.* 7:2–31, so long as the intention is to endorse the entire instrument, *R. S.* 7:2–32. And the intention of the parties to a negotiable instrument must be garnered from the "eight corners" thereof, no particular part is to be preferred. See *Farmers' Bank v. Ewing,* 78 *Ky.* 264, 39 *Am. Rep.* 231 (1880); 10 *C. J. S. Bills and Notes* § 42(*b*). The endorsers placed their two signatures on the note as part of one transaction. It cannot be said that the first signature at the top was a general endorsement and that the second signature at the bottom was not intended to have any effect. The fact that the second signature was below the Schedule of Payments indicated that the parties intended it to have legal effect.

If there was in fact a subsequent alteration, there can be no question that it materially altered the rights of the parties. The effect of the eight lines reciting the con-

sideration was to prohibit the defendants from showing a contrary parol agreement, a right which they would otherwise have under the Negotiable Instruments Law. The plaintiff was not a holder in due course. Thus, the endorsers under *R. S.* 7:2–16 might show a parol agreement that the delivery was conditional upon the extension of a new line of credit, or, what amounts to the same thing, under *R. S.* 7:2–58, that there was a failure of an agreed-upon consideration.

The judgment appealed from is reversed. For the reasons advanced in this opinion the order setting aside the jury's verdict is affirmed and the cause shall be remanded for a new trial without a jury unless plaintiff agrees otherwise.

HEHER, J. (concurring in reversal). The constitutional right of trial by jury may be waived; and so also a contractual stipulation to submit an issue of fact to the court without a jury may be waived by the parties.

The right of trial by jury is favored in the law, "as a fundamental guaranty of the rights and liberties of the people"; and waivers of the right are strictly construed. *Parsons v. Bedford, Breedlove & Robeson,* 3 *Pet.* 433, 7 *L. Ed.* 732 (1830); *Slocum v. New York Life Ins. Co.,* 228 *U. S.* 364, 33 *S. Ct.* 523, 57 *L. Ed.* 879 (1912). The waiver asserted here depends upon the intention of the parties; and, "as the right of jury trial is fundamental, courts indulge every reasonable presumption against waiver." *Aetna Insurance Co. v. Kennedy,* 301 *U. S.* 389, 57 *S. Ct.* 809, 81 *L. Ed.* 1177 (1936).

The defenses here are that the defendants severally endorsed the notes in suit in consideration of plaintiff's promise to extend a new and additional line of credit to the maker of the notes and thus to enable him to finance a continuance of his automobile sales business, and that the contrary stipulation of forbearance merely was typed on the notes, unknown to the endorsers, after their signatures had been affixed, and thus to signify a substantially different agreement between the parties, and the endorsements are void for "failure and

absence of consideration" and a material alteration of the instruments.

It would seem that the printed waiver of trial by jury was not intended to apply in these circumstances. And this was the parties' own understanding of the contractual relation. The plaintiff proceeded to a trial by jury without invoking the contractual right now asserted and, then, for the first time, after the jury's adverse verdict and the order for a new trial, demanded trial without a jury.

It was then too late for a radically different view of the contract in this regard. The parties had elected to proceed to trial by jury, and the election should, for obvious reasons of policy, be deemed conclusive. Such is the principle of *Lerner v. McDermott,* 11 *N. J. Misc.* 99 *(Sup. Ct.* 1933) ; *Friedman v. Steinhauser,* 13 *N. J. Misc.* 601 *(Sup. Ct.* 1935).

I would reverse the judgment and, in the particular circumstances, I join with the majority in directing a new trial, save that it shall be a trial by jury.

HEHER, J., concurring in result.

*For reversal and remandment*—Justices HEHER, BURLING, FRANCIS and PROCTOR—4.

*For affirmance*—Justice WACHENFELD—1.