704 A.2d 1025

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, IN
THE INTEREST OF M.G., JUVENILE–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued December 10, 1997—Decided January 21, 1998.

Before Judges MUIR, Jr., KESTIN and STEINBERG.

*Stephen W. Kirsch,* Assistant Deputy Public Defender, argued the cause for appellant (*Ivelisse Torres, Public Defender,* attorney; *Mr. Kirsch,* of counsel and on the brief).

*Barbara Petersen,* Assistant Prosecutor, argued the cause for respondent (*William H. Schmidt,* Bergen County Prosecutor,

attorney; *Ms. Petersen*, Assistant Prosecutor, of counsel and on the brief).

The opinion of the court was delivered by

MUIR, Jr., J.A.D.

This is a case of statutory construction. It requires us to determine whether possession of two saran wrapped sheets of blotter paper perforated into 100 separate sections, each imprinted with smiley faces, a conventional medium utilized for dispensing lysergic acid diethylamide, but devoid of LSD, constitutes possession of an imitation controlled dangerous substance as criminalized by *N.J.S.A.* 2C:35-11.

The trial court concluded the sheets of blotter paper fell within the intendment of the statute and adjudicated M.G. delinquent on charges of possession that would have constituted a violation of the statute if committed by an adult. M.G. appeals from the ensuing order of adjudication which imposed five years of probation, appropriate monetary assessments, and a six-month driver's license suspension.

M.G.'s contentions on appeal are:

A JUDGMENT OF ACQUITTAL SHOULD HAVE BEEN ENTERED FOR THE JUVENILE SINCE THE PAPER WHICH HE POSSESSED WAS NOT AN "IMITATION CONTROLLED DANGEROUS SUBSTANCE."

   A.  There Was No "Substance" In This Case Which Fits Under The Statutory Definition Of Imitation Controlled Dangerous Substance.

   B.  In New Jersey, Blotter Paper Is Not An "Adulterant Or Dilutant" Which Should Be Weighed With LSD To Determine The Degree Of The Offense.

   C.  Alternatively, Even If Blotter Paper Is An "Adulterant Or Dilutant" Which Should Be Weighed With The LSD In Order To Determine The Degree Of The Offense, Blotter Paper *Without* LSD On It Nevertheless Is Not An Imitation Controlled Dangerous Substance.

We affirm.

On July 18, 1995, Israel Brown, an undercover narcotics agent aided by a confidential informant, arranged to purchase LSD from A.K. The parties met in a Kmart parking lot in Elmwood Park. Brown purchased two tabs or hits of LSD (blotter paper saturated

with a total of .1 gram of LSD) from A.K., R.K., and a third individual believed to be M.G. Brown encouraged A.K. to call him to arrange future sales.

On July 19, 1995, A.K. called Brown and arranged to consummate another sale of LSD. This time, Brown told A.K. he wanted to purchase two sheets of LSD containing 100 hits per sheet plus four hits of the drug to sample.

Brown arrived at the Kmart parking lot around 8 p.m. Wired with a transmitter to record his conversations, Brown also arranged for surveillance by narcotics task force personnel.

Shortly after Brown arrived, M.G., A.K., and a third juvenile arrived in a Chevrolet owned by M.G.'s mother with M.G. driving. M.G., A.K., and Brown then engaged in a "drug related conversation." Brown asked the whereabouts of the LSD. A.K. responded, "My boy has the shit," referring to the third juvenile left sitting in the Chevrolet.

M.G. then said, "We're not going to do it here." The three then walked toward the Chevrolet. Upon reaching the car, M.G. indicated an unwillingness to consummate the sale because he suspected an older man sitting in a nearby van might be a police officer.

Brown suggested they move to another place in the parking lot to complete the sale. M.G. and A.K. agreed and got back into their car and started toward the new location. Members of the task force stopped the car and placed M.G. and his colleagues under arrest.

After the arrest, a search of the Chevrolet yielded two saran wrapped sheets of blotter paper, each perforated into 100 sections with each section imprinted with black and white smiley faces. It is undisputed the sheets were styled and packaged in a traditional manner used to transfer LSD. In this instance, the blotter paper sections tested negative for LSD.

As a consequence of the negative test results, the trial court granted the State's application to amend the complaint for the

events of July 19, 1995, to possession of imitation controlled dangerous substances. Initially, the juvenile complaints charged possession with intent to distribute and distribution on both July 18 and July 19.

At trial, Brown testified he arranged to meet A.K., M.G., and their accomplice to purchase two perforated sheets of 100 hits of LSD. Brown, a trained narcotics officer, testified he believed the two sheets found in the Chevrolet were "the real stuff." Other officers on hand added they believed the two sheets were LSD.

The trial court found M.G. guilty of possession of imitation drugs on July 19, 1995. The court had previously found defendant not guilty of charges relating to the July 18, 1995, events. In finding defendant guilty, the court rejected M.G.'s version of the events and stated:

[On the 19th, M.G.] by his own admission was present with [A.K.]. They were together in the parking lot. There was testimony from Israel Brown that a drug related conversation was entered into by him with them. There was not a question in my mind of any entrapment in this case. The fact is that [M.G.] drove to that parking lot, and based on all of the testimony he knew why he was there. It wasn't to pick up a girlfriend. It wasn't for him to find a girlfriend for [A.K.] to pick up in that car.

He was present when testimony stated let's do this somewhere else.... Here there was a drug related conversation immediately before the drugs in plain view were taken from [M.G.'s] own automobile, he knew. And there's no other conclusion the Court could come to but that he was in possession that night, and the possession was in his automobile in open view, and he was there, and he knew why he was there.

He wasn't fooled by two people speaking Russian for one minute. He knew who these people were. He knew why they were there. I don't have to come to the conclusion that he was involved on the 18th in order to be convicted for the 19th.... I find him guilty of possession, straight possession of an imitation LSD.

The court thereafter entered the previously noted order of disposition, and this appeal ensued.

*N.J.S.A.* 2C:35-11, the imitation drug statute, provides in relevant part:

a. It is unlawful for any person to distribute or to possess or have under his control with intent to distribute any substance which is not a controlled dangerous substance or controlled substance analog:

(1) Upon the express or implied representation to the recipient that the substance is a controlled dangerous substance or controlled substance analog; or

(2) Upon the express or implied representation to the recipient that the substance is of such nature, appearance or effect that the recipient will be able to distribute or use the substance as a controlled dangerous substance or controlled substance analog; or

(3) Under circumstances which would lead a reasonable person to believe that the substance is a controlled dangerous substance or controlled substance analog.

Any of the following shall constitute prima facie evidence of such circumstances:

(a) The substance was packaged in a manner normally used for the unlawful distribution of controlled dangerous substances or controlled substance analogs.

(b) The distribution or attempted distribution of the substance was accompanied by an exchange of or demand for money or other thing as consideration for the substance, and the value of the consideration exceeded the reasonable value of the substance.

(c) The physical appearance of the substance is substantially the same as that of a specific controlled dangerous substance or controlled substance analog.

b. It is unlawful for any person to manufacture, compound, encapsulate, package or imprint any substance which is not a controlled dangerous substance, controlled substance analog or any combination of such substances, other than a prescription drug, with the purpose that it resemble or duplicate the physical appearance of the finished form, package, label or imprint of a controlled dangerous substance or controlled substance analog.

■ The statute must be viewed in the context of the controlled dangerous substance involved. There is no dispute that LSD is an odorless, colorless liquid. In *Chapman v. United States,* 500 *U.S.* 453, 457, 111 *S.Ct.* 1919, 1922, 114 *L.Ed.*2d 524, 533 (1991), a case both parties rely upon for a description of the nature and manner of sale of LSD, the Court explained:

[T]he LSD in an average does weighs 0.05 milligrams; there are therefore 20,000 pure doses in a gram. The pure dose is such an infinitesimal amount that it must be sold to retail customers in a "carrier." Pure LSD is dissolved in a solvent such as alcohol, and either the solution is sprayed on paper or gelatin, or paper is dipped in the solution. The solvent evaporates, leaving minute amounts of LSD trapped in the paper or gel. Then the paper or gel is cut into "one-dose" squares and sold by the dose. Users either swallow the squares, lick them until the drug is released, or drop them into a beverage, thereby releasing the drug.

■ M.G. argues the blotter paper itself cannot be considered an "imitation controlled dangerous substance." He reasons the paper is simply a container, a transfer medium similar to a pipe used to smoke marijuana or crack cocaine. While conceding there

is neither apparent ambiguity nor unconstitutional vagueness in the statute, M.G. asserts, if the statute is considered ambiguous, it must be strictly construed, citing *State v. Valentin,* 105 *N.J.* 14, 17–18, 519 *A.*2d 322 (1987). Given the plain language of the statute and the uniqueness of both LSD and its traditional manner of sale, we conclude the two sheets of saran wrapped, perforated, imprinted blotter paper constituted imitation controlled dangerous substances within the intendment of the statute. We find chimerical M.G.'s efforts to delimit the scope of the word "substance" and to analogize the blotter paper to a pipe used for smoking controlled dangerous substances.

As we stated at the outset, this is a case of statutory construction. While there are many canons of construction that are utilized to resolve the meaning of a statute, cardinal among them is the plain language canon. That canon predicates it is the statute as written that governs. *See Perez v. Pantasote, Inc.,* 95 *N.J.* 105, 114, 469 *A.*2d 22 (1984). The search for intendment of a statute must begin with the words used. What the law as enacted says provides its meaning, and no further search is necessary or appropriate in absence of clear ambiguity. *See Watt v. Mayor and Council of Franklin,* 21 *N.J.* 274, 277, 121 *A.*2d 499 (1956); *In re Podias,* 284 *N.J.Super.* 674, 677, 666 *A.*2d 209 (App.Div.1995); *Gauntt v. Mayor and Council of Bridgeton,* 194 *N.J.Super.* 468, 483, 477 *A.*2d 381 (App.Div.1984). Courts interpret law rather than reconstruct legislative intention. Clear language precludes affording a statute any meaning other than as expressed.

A straightforward reading of the plain language of the statute demonstrates the propriety of the trial court's ruling. The statutory intent is reflected in the language criminalizing a person's possession, manufacture, distribution, or possession with intent to distribute any substance that is packaged or imprinted with the purpose of resembling or duplicating the physical appearance of the packaging or imprinting of an actual controlled dangerous substance. The plain meaning of "substance" is something that has materiality or consistency. That plain meaning does not

implicate the distinction M.G. propounds. When a substance is packaged in a manner normally used for unlawful transfer of controlled dangerous substances, there is prima facie evidence of circumstances that would lead a reasonable person to believe the substance is the controlled dangerous substance replicated by the packaging. *See N.J.S.A.* 2C:35–11a(3)(a), (b). In sum, the statutory plain language criminalizes, for the purposes here, the possession of a substance that is designed to replicate the real LSD.

The overwhelming evidence is that the blotter paper sheets were a substance packaged and imprinted in a manner designed to lead a reasonable person to believe it contained LSD. Brown arranged to acquire two sheets of LSD containing 100 hits on each sheet. A.K. and M.G. expressly represented the sheets were in the Chevrolet. The sheets found in the Chevrolet contained what visually appeared to be Brown's order, two sheets of 100 perforated sections with smiley faces imprinted on each section encased in saran wrap. The saran wrap added an additional reality to the conventional perforated sheets and imprinting because, when real LSD is involved, saran wrap packaging is necessary to prevent absorption of the LSD through the skin. The visual nature of the sheets as packaged indisputably engendered circumstances designed to lead a reasonable person to believe the sheets contained LSD.

These circumstances, compounded with the uniqueness of the drug, which encompass an indiscernibility of LSD's presence by unaided human senses, aside from ingestion, satisfy us defendant possessed an imitation substance criminalized by the statute. *See People v. Terry H.,* 40 *Cal.App.* 4th 1675, 47 *Cal.Rptr.*2d 791 (Cal.Ct.App.1995).

We find M.G.'s remaining contentions to be without merit. *R.* 2:11–3(e)(2).

The order of disposition is affirmed.