920 A.2d 693 (2007)
392 N.J. Super. 270
Carol BEDFORD and H. Paul Bedford, Her Husband, Plaintiffs-Appellants,
v.
Anthony L. RIELLO, D.C., Peter E. Lowenstein, D.C., Coastal Chiropractic, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Telephonically Argued March 7, 2007.
Decided April 18, 2007.
*694 Danielle S. Chandonnet argued the cause for appellants (Shebell & Shebell, attorneys; Thomas F. Shebell, III, Ocean Township, of counsel; Ms. Chandonnet, on the brief).
Mary Ann Nobile Wilderotter argued the cause for respondents (Ronan, Tuzzio & Giannone, attorneys; Ms. Wilderotter, of counsel and on the brief).
Labady and Randolph, attorneys for amicus curiae, Association of New Jersey Chiropractors (Jeffrey B. Randolph, Montvale, on the brief).
Before Judges WINKELSTEIN, FUENTES and BAXTER.
The opinion of the court was delivered by
WINKELSTEIN, J.A.D.
Plaintiff Carol Bedford sued defendant chiropractors Anthony Riello and Peter Lowenstein for medical malpractice, claiming she suffered a torn meniscus following their adjustments of her left knee.[1] The jury returned a verdict for defendants.
Prior to the trial, in a motion in limine, plaintiff asked the court to rule, as a matter of law, that N.J.S.A. 45:9-14.5 and N.J.A.C. 13:44E-1.1, the statute and regulation, respectively, that govern the practice of chiropractors in New Jersey, do not permit chiropractors to adjust a patient's knee, only the patient's spinal column. The motion judge denied plaintiff's motion and concluded that the scope of chiropractic practice in New Jersey permits chiropractors to adjust a patient's knees and other extremities.
Plaintiff challenges that decision on appeal. She claims that the scope of chiropractic practice in New Jersey is limited to adjustments of articulations of the spinal column, and that adjustment of a person's knees is not authorized. Consequently, she asserts that the jury should have been so charged and her experts should have been permitted to so testify. We agree, and consequently reverse and remand for a new trial.[2]
The trial evidence shows that between 1989 and 1999, Dr. Lowenstein treated plaintiff between 180 and 190 times, adjusting her back, neck and hips. She occasionally sought treatment from Dr. Riello, with whom Dr. Lowenstein shared office space. Prior to December 28, 1999, neither doctor had performed an adjustment of her knee; on that day, she *695 treated with Dr. Riello because Dr. Lowenstein was on vacation.
During the visit, she related to Dr. Riello that she had been experiencing pain in her right hip and groin area, which was common for her, and she had begun to experience an ache in her left knee. She explained to the jury what happened after Dr. Riello began to examine her: "I was on my back, and before I knew it, my left leg was draped over his arm and he pushed down . . . just like a lever, and I heard a pop and [felt] burning immediately." When she told Dr. Riello that her knee hurt, he told her to put ice on it. As she got off the examining table, her knee throbbed, burned, and "hurt . . . very badly."
Plaintiff treated with Dr. Lowenstein when he returned from vacation. She explained to him how Dr. Riello had adjusted her knee, and he informed her that he would have done the "exact same thing." In fact, after Dr. Lowenstein adjusted her back and hips, he proceeded to place her knee over his arm, and pushed down. Plaintiff experienced pain and again heard a popping sound, similar to the sound she heard when Dr. Riello adjusted her knee, but not as loud.
In July 2001, plaintiff underwent arthroscopic surgery to repair a torn meniscus in her left knee. She had another surgery in October 2001, to remove a cyst from behind the knee. She testified that, at the time of trial, she continued to have pain and disability in her knee.
Plaintiff's expert, Dr. Robert McCutcheon, concluded that Dr. Riello deviated from the standard of care by failing to properly examine plaintiff and identify any subluxation of the knee that required an adjustment. He explained that a subluxation is an abnormality, a "fixation within the normal range of motion" for a joint. He testified that a fixation means that the "articulation," which he defined as the connection between two bones, "is not functioning properly. It is not dislocated. It's within the normal range but it's fixed." The standard of care dictated that a chiropractor first identify a subluxation prior to performing an adjustment, which Dr. McCutcheon claimed Dr. Riello failed to do. The doctor further testified that the procedure Dr. Riello used "was probably the most forceful manipulation of any joint in the body"; in a knee adjustment, a chiropractor "us[es] the mechanical leverage of the length of the leg. No other part in the body can do that." In Dr. McCutcheon's opinion, Dr. Lowenstein also deviated from the standard of care by not performing "an examination and [by] repeat[ing] in possibly a similar manner the initial insult to the knee."
On cross-examination, Dr. McCutcheon acknowledged that Dr. Riello's technique was in fact proper, assuming adjustment was required. Dr. McCutcheon had been barred by the motion judge's pretrial ruling from testifying that, regardless of how performed, adjustment of the knee was outside the scope of chiropractic practice in New Jersey.
Plaintiff also presented the expert testimony of Dr. Robert Dennis, an orthopedic surgeon, who, after examining plaintiff, testified that her meniscus  the cartilage in her knee  had been "vigorously" and "significantly torn." In his opinion, those injuries were caused by the adjustment performed by Dr. Riello. Using a model of the knee, Dr. Dennis demonstrated the type of maneuver he believed defendants had performed, noting that it gave defendants "huge leverage" with which they were able to "create a lot of force." Dr. Dennis also opined that plaintiff's two surgeries were needed as a result of defendants' treatment.
*696 Dr. Lowenstein testified that a knee adjustment is not "an extreme and violent action"; it merely creates a lever to separate the parts of the joint, which become compressed through daily activity. He also claimed that hearing a popping sound like the one plaintiff heard is common during chiropractic adjustment, and indeed, common during normal walking; it does not indicate a cartilage tear. He said that knee adjustments, properly performed, involve no twisting or torquing, cannot cause meniscal tears, and should not result in harm to the patient.
It was Dr. Lowenstein's recollection that he did not actually adjust plaintiff's knee. He claimed plaintiff was mistaken, confusing an adjustment with a regular check of her knee. He testified that the only difference between checking a knee and adjusting it is that in an adjustment, the doctor applies a "thrust at the end" of the movement.
Dr. Riello explained to the jury that he chose to adjust plaintiff's knee because he believed she had a "posterior tibial subluxation" that was related to her knee pain. He demonstrated for the jury, using Dr. Lowenstein as his patient, how he performs knee adjustments. He disagreed with plaintiff's explanation of the adjustment, claiming no "forcing" action was involved. He also disagreed with Dr. Dennis's testimony about how an adjustment is performed. Dr. Riello asserted that he never twisted, grinded, or applied load-bearing force to plaintiff's knee. He asserted that a properly performed knee adjustment poses no risk of a meniscal tear. He described it as a gentle adjustment. And, while a popping sound may be indicative of a meniscal tear, he claimed it usually only indicates bone movement.
Defendants' expert, Dr. Philip Santiago, testified that chiropractors routinely adjust extremities, including knees. He also gave his opinion that neither defendant deviated from the standard of care. He testified that to properly adjust a knee, a chiropractor "put[s] a little impulse  almost like . . . cracking your knuckles  right on top of the meniscus." The purpose of the adjustment is to "open up" the joint. Dr. Santiago claimed that rather than being the "riskiest procedure," as Dr. McCutcheon suggested, a knee adjustment is a simple and benign procedure that, when performed correctly on a joint that is not broken, carries no complications or risks. He asserted that a knee adjustment could not cause a meniscal tear, which is caused by "compression and shearing" of the joint. He claimed that a knee adjustment has the opposite effect, it "distract[s]" the meniscus. He also explained that the popping sound heard during an adjustment results when "you pull [the joint] apart[;] it makes a little bit of a gas bubble and [the] gas bubbles break."
The issue plaintiff raises on appeal, whether chiropractic practice in New Jersey includes knee adjustments, was originally brought in a motion in limine, filed on the Friday before the Monday trial date. The motion judge first determined that because plaintiff's interrogatory answers did not assert a violation of the statute on which the motion was grounded, N.J.S.A. 49:9-14.5, he would not entertain an argument based on that statute on the eve of trial. Nonetheless, because plaintiff had asserted a violation of the concomitant regulation, N.J.A.C. 13:44E-1.1, in her answers to interrogatories, the judge did address whether the scope of chiropractic practice under the regulation included adjustment of the knee joint. After reading the regulation into the record, the judge was "satisfied that the language therein contained does not preclude the adjustment of a knee" or "of other extremities such as the wrist and/or the ankle."
*697 Trial began the following Monday before another judge. The jury returned a verdict that defendants did not deviate from the standard of care; the jury did not reach the issue of whether plaintiff's torn meniscus was proximately caused by defendants' treatment.
We turn first to plaintiff's primary argument on appeal, that N.J.A.C. 13:44E-1.1, the regulation which, along with the controlling statute, N.J.S.A. 45:9-14.5, defines the scope of practice for chiropractors in New Jersey, precludes a chiropractor from adjusting joints unrelated to a patient's spine, in this case, plaintiff's left knee.[3] Although the motion judge declined to address plaintiff's motion in limine as it pertained to the statute because plaintiff failed to raise the issue of a statutory violation in her answers to interrogatories, we choose to examine the statute because a proper analysis of the meaning of the regulation requires an examination of the statute under which it was promulgated. See N.J. Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 561-62, 384 A.2d 795 (1978) (administrative regulation must be within the fair contemplation of the delegation of the enabling statute).
The statute states: "the practice of chiropractic is defined as follows: `A system of adjusting the articulations of the spinal column by manipulation thereof.'" N.J.S.A. 45:9-14.5. The regulation is similar, but contains additional language not included in the statute. It states: "[t]he practice of chiropractic is that patient health care discipline whose methodology is the adjustment and/or manipulation of the articulations of the spine and related structures." N.J.A.C. 13:44E-1.1(a) (emphasis added). The issue is whether these enactments limit the scope of chiropractic practice to adjustments of the spine, precluding adjustments of a patient's knee and other extremities.
Plaintiff claims that the trial court should have held a hearing pursuant to N.J.R.E. 104(a) to determine the meaning of the statute and regulations. Plaintiff offered her expert, as a drafter of the regulation, to testify as to its meaning. The judge rejected that offer, observing that "experts are not going to be permitted to testify as to their opinion of what the law in New Jersey is." We agree. It is the court's function to interpret the law. Sassarro v. Wright Aeronautical Corp., 135 N.J.L. 366, 370, 52 A.2d 151 (Sup.Ct. 1947); see also State ex rel. M.G. 307 N.J.Super. 348, 354, 704 A.2d 1025 (App. Div.) ("[c]ourts interpret law"), certif. denied, 154 N.J. 607, 713 A.2d 498 (1998). In interpreting the law, "statements of individual legislators are not generally considered to be a reliable guide to legislative intent." State v. Yothers, 282 N.J.Super. 86, 104, 659 A.2d 514 (App.Div.1995) (Skillman, J., dissenting) (citing W. Va. Univ. Hosps., Inc. v. Casey, 499 U.S. 83, 98-99, 111 S.Ct. 1138, 1147, 113 L.Ed.2d 68, 83 (1991)). Thus, the construction of the regulation was the province of the court, and an N.J.R.E. 104(a) hearing was not required.
The question remains, then, whether the motion judge properly interpreted the regulation. We conclude that he did not.
An agency may not, under the guise of interpretation, give a statute greater effect than its language allows. *698 Saint Peter's Univ. Hosp. v. Lacy, 185 N.J. 1, 13, 878 A.2d 829 (2005). Nevertheless, courts generally give great deference to an agency's interpretation and implementation of its rules enforcing the statutes for which it is responsible. Ibid. Such deference recognizes that agencies have the specialized expertise necessary to enact regulations dealing with technical matters and are particularly well equipped to evaluate the factual and technical issues that rulemaking involves. Ibid.
The State Board of Chiropractic Examiners (Board) is charged with the promulgation of rules and regulations necessary to effectuate N.J.S.A. 45:9-14.5. N.J.S.A. 45:9-41.23(h). Pursuant to that rule-making function, the Board promulgated N.J.A.C. 13:44E-1.1, titled "Scope of practice." The Board originally proposed N.J.A.C. 13:44E-1.1 on July 15, 1991. 23 N.J.R. 2100(a) (July 15, 1991). After allowing for comment on the proposed regulation, the Board published all submitted comments and its responses. 24 N.J.R. 642(a) (Feb. 18, 1992). Pertinent to the issue here were the following exchanges regarding the scope of N.J.A.C. 13:44E-1.1(a):
COMMENT: Two commenters requested that the Board expand the scope of practice to include all joints and bones of the body. . . .
RESPONSE: The Board of Chiropractic Examiners may promulgate rules only to the extent authorized by statute. The enabling legislation limits the practice of chiropractic to the spinal column. Accordingly, the requested expansion of scope of practice would be beyond the delegated authority of the Board to implement.
[24 N.J.R. 642(a).]
COMMENT: Several commenters suggested that the first sentence of the proposal which defines the scope of practice to include the spine and related structures was too vague and that "related structures" should be more specifically defined.
RESPONSE: The Board believes that the rule does not require further clarification in that it is consistent with prior practice and has been understood and interpreted in the past to naturally include the biomechanic and neurologic systems which impact on the spine.
[24 N.J.R. 643 (Feb. 18, 1992).]
As to the first comment and response, the Board explained that its regulation limited the scope of chiropractic practice to the spinal column and that it did not perceive that the scope of practice included all joints and bones. The Board expressly recognized that to extend the scope of practice to include all joints and bones would exceed the scope of practice defined in N.J.S.A. 45:9-14.5 and would violate the authority expressly delegated to the Board by the Legislature.
The response to the second comment is somewhat less clear, but when read in light of the governing statute and the Board's response to the first comment, we take it to mean that the term "related structures" may permit a chiropractor to maneuver other structures, such as the knee, but only as the movement impacts upon the spine.[4]N.J.S.A. 45:9-14.5 defines chiropractic as a "system of adjusting the articulations of the spinal column by manipulation thereof." Stedman's Medical Dictionary 152 (27th ed.2000) defines an "articulation" as a "joint." That definition is consistent with the testimony of plaintiff's expert, Dr. McCutcheon. Thus, the language of the statute confines chiropractic *699 to adjustment of the joints of the spinal column. The Board recognized as much and further evinced an intent not to transcend the authority granted to it by the statute. 24 N.J.R. 642(a) ("the enabling legislation limits the practice of chiropractic to the spinal column . . . expansion of scope of practice would be beyond the delegated authority of the Board"). Whatever ambiguities may lie in the Board's second response regarding its refusal to clarify the meaning of the term "related structures," 24 N.J.R. 643, in light of the statute and the Board's other response, that ambiguity cannot be resolved to permit adjustment of a joint, such as the knee joint, which is not an articulation of the spine.
Before N.J.S.A. 49:9-14.5 was adopted in its current form, the statute defined the practice of chiropractic as "[t]he detecting and adjusting, by hand only, of vertebral subluxations." L. 1939, c. 115, § 19 (emphasis added). The statute as currently written, which was revised in 1953, L. 1953, c. 233, § 3, removed the requirement that adjustments be "by hand only," but continued to limit the practice to adjusting the "articulations of the spinal column." N.J.S.A. 45:19-14.5.
The Board adopted N.J.A.C. 13:44E-1.1 on November 21, 1991. 24 N.J.R. 642(a). The language of the regulation has not changed since it was promulgated. Giving deference to the Board's interpretation of its rules implementing the statute for which it is responsible, Saint Peter's, supra, 185 N.J. at 13, 878 A.2d 829, we conclude that the scope of chiropractic in New Jersey is limited to adjustments of the spinal column and does not include the adjustment of other joints. Cf. Prudential Prop. & Cas. Ins. Co. of N.J. v. Nardone, 332 N.J.Super. 126, 133, 752 A.2d 859 (Law Div.2000) (muscle strengthening exercises and soft tissue stretching do not constitute "adjustment or manipulation of articulations of the spine" pursuant to N.J.S.A. 45:9-14.5). Such an interpretation is consistent with the enabling statute. Cf. N.J. Tpk. Auth. v. AFSCME Council 73, 150 N.J. 331, 351-52, 696 A.2d 585 (1997) (regulation at odds with statute must be set aside). Consequently, we disagree with the motion judge's determination that N.J.A.C. 13:44E-1.1(a) "does not preclude the adjustment of a knee" or "of other extremities such as the wrist and/or ankle."
That said, we next address the effect of this decision on the trial. Our decision does not mean that, as a matter of law, defendants violated the standard of care. Plaintiff would, however, be entitled to a jury instruction that regardless of how the knee adjustment was performed, any such adjustment was outside the scope of chiropractic practice in New Jersey, and that defendants' violation of the code could be considered evidence of negligence.[5]See Frugis v. Bracigliano, 177 N.J. 250, 271, 827 A.2d 1040 (2003) (finding that violation of an administrative code provision, while not negligence per se, was evidence of negligence); cf. Model Jury Charge (Civil), 5.20D, "Violation of Traffic Act" (Aug. 1999) (instructing jury to consider not only statutory violation but also "other or additional evidence bearing upon [the] issue" of the defendant's negligence). Also remaining for the jury to decide, if it finds that defendants violated the standard of care, is whether the violation of the standard of care proximately caused plaintiff's injuries.
*700 We perceive that based on our decision, should a new trial take place, the experts' testimony may be different from that offered at the first trial. Subject to the trial court's discretion, the parties may offer new evidence on retrial. See Franklin Disc. Co. v. Ford, 27 N.J. 473, 492, 143 A.2d 161 (1958) (where new trial granted, "case stands as if there had never been a trial" (quoting Kimble v. Degenring, 116 N.J.L. 602, 603, 186 A. 451 (Sup.Ct.1936))).
Finally, we address defendants' argument that N.J.S.A. 45:9-41.27, a provision of the Chiropractic Board Act, N.J.S.A. 45:9-41.17 to -41.27, permitted defendants to adjust plaintiff's knee. That statute states:
The scope of practice of chiropractic shall remain as defined in existing statutes. Nothing in this act shall be deemed to prohibit a chiropractor from caring for chiropractic subluxation as determined by chiropractic analytical procedures. Chiropractic analysis which identifies the existence of a subluxation may be the only basis for chiropractic care.
[N.J.S.A. 45:9-41.27 (emphasis added).]
Defendants' reliance on this statute is misplaced. The statute specifically limits the scope of chiropractic practice to that encompassed by N.J.S.A. 45:9-14.5. And, while the statute permits recognized "chiropractic analytical procedures," which may allow a chiropractor to maneuver a patient's limbs to assist in adjusting the patient's spine, that is not what occurred here. Dr. Riello testified that it was plaintiff's knee he adjusted; he did not testify that he manipulated her knee to correct or adjust a subluxation of her spine. Dr. Santiago testified that chiropractors independently adjust extremities, including knees, and he explained to the jury how to properly adjust a knee. He also noted that the purpose of a knee adjustment is to "open up" that particular joint; he did not say a knee adjustment was performed to affect a subluxation of plaintiff's spine. While he testified about a "kinetic linkage" between the spine and the extremities, the complained of adjustments here were to plaintiff's knee, not to her spine.
Reversed and remanded for further proceedings consistent with this opinion.
NOTES
[1] Plaintiff's husband, H. Paul Bedford, has a per quod claim. All references to "plaintiff" in this opinion are to Carol Bedford.
[2] In her lawsuit, plaintiff also claimed a lack of informed consent to the knee adjustment. Plaintiff abandoned that issue at the charge conference.
[3] On appeal, plaintiff does not challenge the regulation as being beyond the scope of the statute. To do so would require that the New Jersey Attorney General be provided with notice, R. 4:28-4, which plaintiff did not do. While the motion judge acknowledged that plaintiff appeared to raise such a challenge in her brief, the judge correctly concluded that the issue was not "before the [c]ourt."
[4] See our discussion of the Chiropractic Board Act, infra, at pp. 17-18.
[5] We do not view a violation of the regulation to constitute negligence per se, as the regulation does not specifically incorporate a standard of care. See J.S. v. R.T.H., 155 N.J. 330, 348-49, 714 A.2d 924 (1998); Eaton v. Eaton, 119 N.J. 628, 642-43, 575 A.2d 858 (1990).