710 A.2d 1041

IN THE MATTER OF THE 1997 ASSESSMENTS MADE BY THE NEW JERSEY PROPERTY–LIABILITY INSURANCE GUARANTY ASSOCIATION PURSUANT TO N.J.S.A. 17:30A–8.

Superior Court of New Jersey
Appellate Division

Argued April 28, 1998—Decided May 20, 1998.

Before Judges LONG, KLEINER and KIMMELMAN.

*Elmer M. Matthews* argued the cause for appellants American Insurance Association and Alliance of American Insurers (*Sterns & Weinroth*, attorneys; *Mr. Matthews*, of counsel and on the brief; *Susan Stryker* and *Mitchell A. Livingston*, on the brief).

*Eleanor Heck* argued the cause for respondents Commissioner of Banking and Insurance and Department of Banking and Insurance (*Peter Verniero*, Attorney General, attorney; *Joseph L. Yannotti*, Assistant Attorney General, of counsel; *Ms. Heck* and *Melissa H. Raksa*, Deputy Attorneys General, on the brief).

*Cynthia J. Borrelli* argued the cause for respondent New Jersey Property–Liability Insurance Guaranty Association (*Bressler, Amery & Ross*, attorneys; *Richard R. Spencer, Jr.*, on the brief).

The opinion of the Court was delivered by

KIMMELMAN, J.A.D.

At issue in this appeal is the contention raised by appellants American Insurance Association and Alliance of American Insurers [1] that the Commissioner of Banking and Insurance (Commissioner) had no legal authority to direct the New Jersey Property–Liability Insurance Guaranty Association (PLIGA) to make

---

[1] Appellants are trade associations consisting of property and casualty insurance companies licensed to do business in New Jersey and all other states.

an eighth annual assessment of $160 million on their members to help defray the unfunded liabilities of the New Jersey Automobile Full Insurance Underwriting Association (commonly known as the Joint Underwriting Association or JUA) and the Market Transition Facility (MTF).

By way of brief historical background, this appeal may best be understood in the following context: For many years, it has been mandatory that automobile liability insurance coverage be maintained by owners of vehicles registered in this State. *N.J.S.A.* 39:6A–3. Prior to 1983, drivers who could not obtain coverage directly from insurers in the open and voluntary market were insured through an assigned risk plan, under which the Commissioner apportioned high-risk drivers amongst all auto insurers doing business in New Jersey. *See N.J.S.A.* 17:29D–1. In 1983, the assigned-risk system was replaced by the Automobile Full Insurance Availability Act, *N.J.S.A.* 17:30E–1 to –24, which created the JUA. *State Farm Mut. Auto. Ins. Co. v. State,* 124 *N.J.* 32, 40–41, 590 *A.*2d 191 (1991).

Under the JUA plan, high-risk drivers were allocated to insurance carriers doing business in the State and to the JUA itself, with premiums set at the same rates as those found in the voluntary market. To defray the added costs incurred from insuring high-risk drivers, the proceeds of certain fees and surcharges on motorists were allocated to the JUA. *N.J.S.A.* 17:30E–8. By 1988, over fifty percent (50%) of New Jersey drivers had to be insured through the JUA, and by 1990, the JUA had accumulated a deficit of over $3.3 billion in unpaid claims and losses. *State Farm, supra,* 124 *N.J.* at 42, 590 *A.*2d 191; *In re Rate Filing by the Market Transition Facility of N.J.,* 252 *N.J.Super.* 260, 265, 599 *A.*2d 906 (App.Div.1991), *certif. denied,* 127 *N.J.* 565, 606 *A.*2d 376 (1992).

The Fair Automobile Insurance Reform Act (FAIRA), *N.J.S.A.* 17:33B–1 to –63, was enacted in 1990 in an attempt to phase out high-risk drivers from the JUA, and with the further purpose of creating funding mechanisms to pay off the JUA's debt. The New

Jersey Automobile Insurance Guaranty Fund (Auto Fund) was created by FAIRA to collect and disburse the monies generated by the various funding mechanisms. *N.J.S.A.* 17:33B–5. For example, *N.J.S.A.* 17:33B–57 to –62 imposed annual fees on lawyers, doctors, chiropractors, therapists, and auto body repair facilities to be remitted to the Auto Fund. Additionally, a significant funding source to help retire the JUA debt was assessments to be imposed by PLIGA on automobile insurance carriers. The proceeds of the assessments were denominated as "loans" to be paid into the Auto Fund. *N.J.S.A.* 17:30A–8a(10).

PLIGA[2] was created in 1974, *N.J.S.A.* 17:30A–1 to –20, to impose assessments on New Jersey property-casualty insurers to be used to pay claims against carriers that had become insolvent. *N.J.S.A.* 17:30A–2a. The Legislature selected PLIGA as the statutory mechanism to collect the additional assessments to be imposed on automobile insurance carriers for the JUA's benefit and to remit the same to the Auto Fund. *N.J.S.A.* 17:30A–5b and –8a. The Legislature obligated PLIGA to:

(9) Assess member insurers in amounts necessary to make loans pursuant to paragraph (10) of this subsection.

[and to]

(10) Make loans in the amount of $160 million per calendar year, beginning in calendar year 1990, to the New Jersey Automobile Insurance Guaranty Fund created pursuant to section 23 of P.L.1990, c.8 (C. 17:33B–5), except that no loan shall be made pursuant to this paragraph after December 31, 1997.

[*N.J.S.A.* 17:30A–8a(9) and (10).]

In *State Farm*, the Supreme Court described the assessment procedure as follows:

These assessments, denominated by the Act as "loans," are paid into the Auto Fund. *N.J.S.A.* 17:30A–8a(10). They are to be set at rates designed to net $160 million per year for eight years (1990 through 1997); for 1990, the assessments represented 2.7% of net premiums of the property-casualty insurers.

---

2 PLIGA is a "*private, nonprofit, unincorporated, legal entity,*" to which anyone writing insurance in New Jersey must belong as a member, as a condition of doing business in the State. *N.J.S.A.* 17:30A–6 and –5(f); *see also, N.J.S.A.* 17:30A–2b (listing types of insurers exempted from membership requirement).

[*State Farm, supra,* 124 *N.J.* at 44, 590 *A.*2d 191.]

Since the annual FAIRA assessments on PLIGA members were based on estimates of the preceding calendar year's premiums, the assessments were made subject to a "true-up" procedure, whereby the correct amount of the annual FAIRA assessment was adjusted or "trued-up" the following year, based upon each insurer's actual net direct written premiums for the assessed year. *N.J.S.A.* 17:30A–8a(9). With respect to the 1997 calendar year assessment, the "trued-up" assessment as to each carrier will not be determined until sometime during 1998. The same truing-up methodology has been used in each year since calendar year 1990. PLIGA does not treat or regard the "trued-up" assessment as a new assessment. Rather, it is treated as relating back to and being a component of the previous year's estimated assessment.

On June 11, 1997, PLIGA issued the eighth and last $160 million assessment under *N.J.S.A.* 17:30A–8a(9), and directed statements to all of its members, reflecting their *pro rata* share of the total. Appellants sought a stay of the enforcement of the assessments, but on July 25, 1997, this court refused the stay and also denied the Commissioner's emergent application for summary disposition of appellants' appeal.

On appeal, appellants contend that the 1997 assessment was beyond the power of the Commissioner, because there was no proof that the money was needed to further defray MTF liabilities. For the reasons which follow, we find this contention to be without merit.

1. Assessments on member insurers of $160 million in each of eight calendar years from 1990 through December 31, 1997, were made mandatory in FAIRA. *N.J.S.A.* 17:33A–8a(9) and (10).

2. The MTF was created in 1990 by FAIRA, *N.J.S.A.* 17:33B–11, to be operated by the Commissioner as an interim successor to the JUA. During the phase-out of the JUA, the MTF was to provide passenger automobile insurance for individuals unable to secure coverage in the voluntary market. Appellants' members

are members of the MTF and "shall share in its ... losses[.]" *N.J.S.A.* 17:33B–11a.

3. The Good Driver Protection Act of 1994 (GDPA), *N.J.S.A.* 34:1B–21.1 to –21.15, requires that the 1996 and 1997 insurance industry payments assessed by and made through PLIGA and loaned to the Auto Fund to finance the JUA's deficit be redirected to the MTF, to be used to meet its "current and anticipated financial obligations." *N.J.S.A.* 34:1B–21.12; *see also Senate Budget and Appropriations Committee Statement,* Senate, No. 1250—L.1994, c. 57 (discussing the potential fiscal impact of the GDPA).

4. Neither FAIRA nor the GDPA require the Commissioner to make a preliminary showing that the 1997 assessment was needed by the MTF. *See In re Musick,* 143 *N.J.* 206, 216, 670 *A.*2d 11 (1996) (holding that courts may intervene only where "an agency action is clearly inconsistent with its statutory mission.").

Consequently, the nub of the controversy on this appeal is whether the Legislature intended FAIRA to effect eight successive calendar year assessments of $160 million each, totalling $1.280 billion, or seven calendar year assessments of $160 million each, totalling $1.120 billion. Appellants rely upon the Fiscal Estimate prepared by the Office of Legislative Services which was annexed to FAIRA in its bill form before the General Assembly. The Fiscal Estimate provided, in pertinent part:

> The bill establishes a new assessment on property-casualty insurers in amounts necessary to loan $160 million per calendar year, for seven years, beginning in 1990 and continuing through 1997, for a total of $1.120 billion.

As a result, the Legislators had before them Assembly Bill No. 1 of 1990, the wording of which directed PLIGA to assess member insurers in amounts necessary to make loans of $160 million per calendar year beginning in 1990, with no assessment and loan to be made after December 31, 1997. The Legislators simultaneously had before them a fiscal note stating that the bill required such assessments to be made in each calendar year for seven years, beginning in 1990 and continuing through 1997.

The mathematical dichotomy contained in the divergent language of the bill and the fiscal note should be obvious. As drawn, the bill clearly provided for assessments of $160 million per year in each of the calendar years "beginning in calendar year 1990," for a total of $1.280 billion. The number of calendar years beginning in 1990 and ending in 1997 is eight. The Supreme Court's analysis in *State Farm, supra,* 124 *N.J.* at 44, 590 *A.*2d 191, is identical. *See also In re Loans of N.J. Prop. Liability Ins. Guaranty Ass'n,* 124 *N.J.* 69, 70, 78–79, 590 *A.*2d 210 (1991) (stating that loans were mandated "for 1990 through 1997"). However, the fiscal note calculates the number of calendar years to be seven. The author of the fiscal note obviously misread the wording of Assembly Bill No. 1 of 1990.

We cannot accept appellants' contention that the Legislators' intent is best evidenced by the fiscal note. The express language of a statute is the preferred indicator of legislative intent. *Strasenburgh v. Straubmuller,* 146 *N.J.* 527, 539, 683 *A.*2d 818 (1996). We must therefore first consider the statute's plain language. *Kimmelman v. Henkels & McCoy, Inc.,* 108 *N.J.* 123, 128, 527 *A.*2d 1368 (1987). Where that language is clear, there is no need for interpretation. *Lopez v. Santiago,* 125 *N.J.Super.* 268, 270, 310 *A.*2d 500 (App.Div.1973). While we may refer to the bill's fiscal note to ascertain legislative intent if necessary, it is the express language of the bill as enacted into law that must govern. *Perez v. Pantasote, Inc.,* 95 *N.J.* 105, 114, 469 *A.*2d 22 (1984); *In re M.G.,* 307 *N.J.Super.* 348, 353, 704 *A.*2d 1025 (App.Div.1998).

We are not at liberty to speculate that the Legislature intended the language of its fiscal note to govern where the conflicting terms of the statute are so plain and obvious. There is no ambiguity in the wording; the statute speaks for itself and will be construed accordingly. *Bunk v. Port Auth. of N.Y. & N.J.,* 144 *N.J.* 176, 194, 676 *A.*2d 118 (1996); *Rosenthal v. State Employees' Retirement Sys.,* 30 *N.J.Super.* 136, 140, 103 *A.*2d 896 (App.Div. 1954). Our sole function is to enforce the statute as written. *Strasenburgh, supra,* 146 *N.J.* at 539, 683 *A.*2d 818.

We have considered all other contentions raised by appellants and find that they are equally without merit. *R.* 2:11–3(e)(1)(E). Under the circumstances, the June 11, 1997, assessment by PLI-GA of its member insurers pursuant to *N.J.S.A.* 17:30A–8 is affirmed.