770 A.2d 741 (2001)
AFFILIATED FM INSURANCE COMPANY; Allendale Mutual Insurance Company; American Modern Home Insurance Company; Arkwright Mutual Insurance Company; Calvert Insurance Company; Cambridge Mutual Fire Insurance Company; Merrimack Mutual Fire Insurance Company; Bay State Insurance Company; Chester County Mutual Insurance Company; Chrysler Insurance Company; The Church Insurance Company; Cumberland Insurance Company, Inc.; Cumberland Mutual Fire Insurance Company; Farmers' Mutual Fire Assurance Association of New Jersey; Fitchburg Mutual Insurance Company; FMI Insurance Company; Franklin Mutual Insurance Company; Garden State Indemnity Co., Inc.; The Hartford Steam Boiler Inspection and Insurance Company; Jewelers Mutual *742 Insurance Company; Mercer Mutual Insurance Company; Pawtucket Mutual Insurance Company; Penn Mutual Insurance Company; Preferred Mutual Insurance Company; Protection Mutual Insurance Company; The Providence Mutual Fire Insurance Company; Quincy Mutual Fire Insurance Company; Farmers Mutual Insurance Company of Salem County; Salem Insurance Company; State Capital Insurance Company; and LMI Insurance Company, Plaintiffs-Appellants,
v.
The STATE of New Jersey; Karen L. Suter, in her official capacity as Acting Commissioner of the State of New Jersey, Department of Banking and Insurance; State of New Jersey, Department of Banking and Insurance; and Roland M. Machold, in his official capacity as Treasurer of the State of New Jersey, Defendants-Respondents, and
Property-Liability Insurance Guaranty Association, Defendant.
Superior Court of New Jersey, Appellate Division.
Argued February 27, 2001.
Decided April 11, 2001.
*744 David S. Stone, Hasbrouck Heights, argued the cause for appellants (Freedman & Stone, attorneys; Mr. Stone, on the brief).
Eleanor Heck, Deputy Attorney General, argued the cause for respondents (John J. Farmer, Jr., Attorney General, attorney; Nancy Kaplen, Assistant Attorney General, of counsel; Ms. Heck, on the brief).
Before Judges PRESSLER, KESTIN and ALLEY.
*743 The opinion of the court was delivered by PRESSLER, P.J.A.D.
Plaintiffs are thirty-one property and casualty insurance companies licensed to do business in this State. All are members of the Property-Liability Insurance Guaranty Association (PLIGA) created in 1974 by N.J.S.A. 17:30A-1 to -20. None of them, during the time period pertinent to this appeal, wrote automobile insurance. They challenge the constitutionality, as applied to them, of the Good Driver Protection Act of 1994 (GDPA), N.J.S.A. 34:1B-21.1 to -21.15. Plaintiffs contend that GDPA violates their right to equal protection as well as their federal and state constitutional protections against impairment of contractual rights conferred upon them by the Fair Automobile Insurance Reform Act of 1990 (FAIRA or Reform Act[1]), N.J.S.A. 17:33B-1 to -64. They also challenge actions taken pursuant to the Act by the Commissioner of Insurance, the State Treasurer, and other State officials and agencies.
The crux of plaintiffs' challenge lies in the provision of the Reform Act that required PLIGA to collect from its members, starting in calendar year 1990, eight annual total assessments of 160 million dollars each for transmission, as loans, to the State Treasury as a contribution to the then accumulated debt of the JUA. Their basic contention is that the effect of the 1994 adoption of GDPA and administrative actions taken thereunder impairs their right to repayment assured by the Reform Act. We reject all of their claims.

I.
Understanding of the present controversy requires a historical foray into the automobile insurance law of the last quarter of a century.
The dispute before us has its genesis in New Jersey's decades-long automobile insurance troubles. Our courts have commented extensively on the history of that protracted debacle up to the point of the 1990 adoption of FAIRA, the mechanisms devised by FAIRA for addressing the crisis that had by then developed, and the problems encountered in implementing the FAIRA scheme. See, e.g., Matter of Commissioner of Ins., 132 N.J. 209, 212-216, 624 A.2d 565 (1993), aff'g 256 N.J.Super. 158, 606 A.2d 851 (App.Div.1992); Matter of Loans of N.J. Prop. Liab. Ins. Guar. *745 Ass'n., 124 N.J. 69, 71-72, 590 A.2d 210 (1991); State Farm v. State, 124 N.J. 32, 40-44, 590 A.2d 191 (1991); Matter of Market Transition Facility, 252 N.J.Super. 260, 263-266, 599 A.2d 906 (App.Div. 1991), certif. denied, 127 N.J. 565, 606 A.2d 376 (1992); Matter of American Reliance Ins. Co., 251 N.J.Super. 541, 545-548, 598 A.2d 1219 (App.Div.1991), certif. denied, 127 N.J. 556, 606 A.2d 369 (1992); Matter of Aetna Cas. & Sur. Co., 248 N.J.Super. 367, 372-375, 591 A.2d 631 (App.Div.), certif. denied, 126 N.J. 385, 599 A.2d 162 (1991), cert. denied, 502 U.S. 1121, 112 S.Ct. 1244, 117 L.Ed.2d 476 (1992); Allstate Ins. Co. v. Fortunato, 248 N.J.Super. 153, 156-157, 590 A.2d 690 (App.Div. 1991). See also the extensive legislative statements, particularly Assembly Appropriations Committee Statement annexed to Assemb., No. 1-L. 1990, c. 8 (FAIRA), and Senate Budget and Appropriations Committee Statement annexed to S., No. 1250-L. 1994, c. 57 (GDPA).
In reviewing that history to the extent it underlies the issues before us, we start with the adoption in 1970 of the assigned-risk plan, requiring the distribution among automobile insurers of those insurance applicants unable to obtain coverage in the voluntary market. N.J.S.A. 17:29D-1. The necessity for drivers to obtain coverage was intensified by the New Jersey Automobile Reparation Reform Act, N.J.S.A. 39:6A-1, et seq., operative in 1973, making automobile insurance compulsory and creating the no-fault benefit scheme. The Legislature's response to the ensuing escalating rates for insurance charged to assigned-risk drivers was the adoption in 1983 of the New Jersey Automobile Full Insurance Availability Act, N.J.S.A. 17:30E-1, et seq., which replaced the assigned-risk scheme with the New Jersey Automobile Full Insurance Underwriting Association, commonly known as the Joint Underwriting Association or JUA, to which all insurers writing automobile business in New Jersey were required to belong. As explained by State Farm v. State, supra, 124 N.J. at 41, 590 A.2d 191, the goal of the JUA "was to create a more extensive system of allocating high-risk drivers to carriers, and through the JUA, to provide such drivers with coverage at rates equivalent to those charged in the voluntary market."
After it had been in operation for seven years, the JUA plan had not only failed in its primary goals, but had proved entirely counterproductive and had resulted in overburdening insurance buyers in the voluntary market. It had been understood from the outset that if the JUA was to be charging voluntary market rates to high-risk drivers, its premium collections would be insufficient to cover the cost of claims. The statute, therefore, had accorded JUA additional sources of revenue, including "Department of Motor Vehicle surcharges for moving violations and drunken driving convictions, policy `flat charges,' and `residual market equalization charges,' or RMECs, to be added to policy rates for voluntary-market insureds. N.J.S.A. 17:30E-8." State Farm, supra, 124 N.J. at 41-42, 590 A.2d 191. By 1988, apparently because of insurance company response to the financial pressures imposed by the JUA scheme, over 50 percent of New Jersey drivers had to be insured by the JUA; the premiums paid by insureds in the voluntary market were increased, at least in part, in order to subsidize the JUA by the mechanism of the RMECs; and the JUA had, despite its additional revenue sources, managed to accumulate a deficit of around 3.3 billion dollars.
The JUA having failed, the Legislature then had to cope once again with the problem of distributing the insurance burden of covering high-risk drivers while at the same time making the cost of automobile *746 insurance reasonably affordable to the general public. Of signal importance, of course, was the devising of a mechanism to pay the JUA debt. FAIRA was its plan for achieving these aims. By the instrumentality of the new Market Transition Facility (MTF), JUA was to be depopulated within two years and a new assigned-risk scheme created and implemented within that time. The MTF then was to go out of business. The greater challenge, as noted, was the payment of the JUA debt. To meet this obligation, FAIRA created the New Jersey Automobile Guaranty Fund (Auto Fund) within the State Treasury to collect and disperse the revenues earmarked for the JUA bail-out. N.J.S.A. 17:33B-5. The motor vehicle surcharges that had been paid to JUA now went into the Auto Fund. Since the RMECs were discontinued, additional sources of revenue for the Auto Fund had to be created. Sources included a new annual fee imposed on lawyers, physicians and other designated health care providers, auto body repair businesses and an increase in automobile registration fees. N.J.S.A. 17:33B-58 to -63. Another source was the imposition of a surtax on automobile insurers. N.J.S.A. 17:33B-49. An additional source, which is the basis of the present controversy, was the assessments created by N.J.S.A. 17:30A-8a(9) and (10).
These assessments, denominated as loans, were imposed on all members of PLIGA, whether automobile insurers, property and casualty insurers, or both. PLIGA had originally been created in 1974 to impose assessments on member insurers, as defined by N.J.S.A. 17:30A-2b, to pay covered claims against insolvent insurers. N.J.S.A. 17:30A-2a. The PLIGA Act was amended simultaneously with the adoption of FAIRA to add subsections (9) and (10) to N.J.S.A. 17A:30A-8. The import of subsection (10) was to require PLIGA to make loans to the Auto Fund in the amount of 160 million dollars a year in calendar years 1990 through and including 1997. Subsection (9) required PLIGA to assess its members, by the methodology therein described, in order to obtain and transmit the annual required loan. Assessed members, moreover, while they had been able to pass over to policy holders the assessments they made to pay claims against insolvent insurers, N.J.S.A. 17:30A-16a, were prohibited from doing so in respect of the Auto Fund assessment, N.J.S.A. 17:30A-16b.
The adoption of FAIRA with its attendant amendment of the PLIGA Act and the creation of the Auto Fund almost immediately spawned a broad range of constitutional challenges by the insurance industry as well as challenges to various implementing orders issued by the Commissioner of Insurance. We limit our review of the ensuing judicial decisions to those that deal directly with or bear significantly on the PLIGA loan scheme.
In State Farm v. State, supra, 124 N.J. 32, 590 A.2d 191, the Supreme Court rejected the industry's facial challenge to the 1990 legislative scheme. More specifically, because neither the automobile insurers' surtax nor the PLIGA members' loan assessments could be passed through to policyholders, the insurers claimed that the scheme constituted a proscribed taking and a denial of due process since a reasonable rate of return was thus being denied them. Relying on N.J.S.A. 17:33B-2g, which assured the industry a reasonable rate of return, the Court concluded, however, that the Commissioner of Insurance had thereby been implicitly granted the power to meet the standard of a fair return and had, in fact, done so by the adoption of regulations permitting application for rate relief if the surtax or assessment made a fair return unrealizable. State Farm, supra, 124 N.J. at 58-63, 590 *747 A.2d 191. State Farm also rejected a constitutional challenge based on the contract clause, U.S. Const. art. I, § 10. Some of the insurers had argued that under the JUA program they had been promised that they would not be liable for JUA debts, and under FAIRA, they were being surcharged and assessed for those debts. The Court's answer was that the JUA was a regulatory scheme subject to legislative amendment and not a contract at all. State Farm v. State, supra, 124 N.J. at 64, 590 A.2d 191. It also explained, pertinent to this litigation:
In a highly regulated business such as insurance, participants cannot credibly assert that they had any vested right or contractual expectation in the indefinite continuance of the JUA scheme. Moreover, even if there were an impairment of a contractual relationship, it would nonetheless be justified in this instance because the Reform Act addresses a significant and legitimate public purpose, imposing reasonable conditions that are related to appropriate governmental objectives.

[Id. at 64-65, 590 A.2d 191.]
Even more relevant to the issues here was the Supreme Court's companion decision to State Farm, that is, Matter of Loans of N.J. Prop. Liab. Ins. Guar. Ass'n., supra, 124 N.J. 69, 590 A.2d 210. The industry challenge there was a direct constitutional attack on subsections (9) and (10) of N.J.S.A. 17:30A-8. The state constitutional claim was premised on the contention that the eight annual loans of 160 million dollars violated the debt limitation provision of N.J. Const., art. VIII, § 2, ¶ 3. The federal constitutional claim was based on the assertion of unconstitutional vagueness in that the statute did not specify terms of repayment of the loans and subjected repayment to a variety of contingencies.
In rejecting those claims, the Court first noted that following the adoption of the Reform Act and in view of the silence of the PLIGA assessment provisions in respect of repayment, PLIGA and the Commissioner of Insurance had entered into negotiations on that subject but were unable to agree on such issues as the establishment of a source of payment, an amortization schedule, or an interest rate. Since the time was drawing near for remitting the first annual assessment, the Commissioner issued an order providing, in pertinent part, that
(1)(a) The Automobile Fund shall repay said loans in a manner to be determined pursuant to paragraph (b) below out of whatever monies are available in the Automobile Fund, subject to their appropriation by the Legislature, after a determination by the Commissioner that there are adequate funds in the Automobile Fund for the retirement of the debt of the JUA or repayment of the loans is otherwise provided for, and subject to the approval of the Treasurer as required by Section 23(e) of the ... Act.
(b) Whereas the amount of the JUA debt and the quantity of funds available to pay that debt are at this time too uncertain to attempt to fix any meaningful repayment schedule for these loans, at a date not later than January 1, 1996, [PLIGA] and the JUA trustee shall meet with the Commissioner or his designee to establish a reasonable repayment schedule for the loans taking into consideration, among other issues, the monies collectible under Section 35 of the ... Act [i.e., funds collected by the Department of Motor Vehicles for violation surcharges] which are to be remitted for repayment of the loans....
[Matter of Loans, supra, 124 N.J. at 72-73, 590 A.2d 210.]
*748 In view of both the statutory provisions and the Order, the Court concluded that the State's acceptance of the assessments did not affect its debt limit for the simple reason that the loans did not create a debt. This was its reasoning:
The provisions made under the Reform Act and Order No. A90-252 for repayment of the PLIGA loans clearly fall within the types of assurances of future payments that this Court has traditionally found not to be "debts." If anything, the repayment of the PLIGA loans is stated less definitely than, for example, the pension-fund contributions or the statutory allotments of revenues that were found not to be debts in City of Passaic v. Consolidated Police and Firemen's Pension Fund Commission, 18 N.J. 137, 113 A.2d 22 (1955) and City of Camden v. Byrne, 82 N.J. 133, 411 A.2d 462 (1980), respectively. The repayment of the PLIGA loans depends upon a number of contingenciesthat there will be funds remaining from motor-vehicle violations surcharges after discharge of the JUA debt; that the Commissioner of Insurance will approve application of such funds to the repayment; that the Legislature will vote the necessary appropriation; and that the Treasurer will approve release of the funds. Thus, we conclude that the State's acceptance of the loans from PLIGA does not create a debt of the State and therefore does not violate article VIII, section II, paragraph 3 of the New Jersey Constitution.

[Id. at 77, 590 A.2d 210.]
The vagueness argument fared no better with the Court. Noting that a commercial regulatory statute can be held unconstitutionally vague only if it is substantially incomprehensible, a defect from which this statutory scheme patently did not suffer, the Court also made clear that the Commissioner, despite the absence of an express delegation, undoubtedly had the implied authority to promulgate eventual terms and conditions of repayment of the loans. Id. at 78-79, 590 A.2d 210.
The constitutional attacks having been rejected by State Farm and Matter of Loans, the industry's challenge then focused on the Commissioner of Insurance's implementation of FAIRA. In Matter of Aetna Cas. and Sur. Co., supra, 248 N.J.Super. 367, 591 A.2d 631, the automobile insurers unsuccessfully disputed, among other directives, the Commissioner's depopulation orders by which risks had been assigned to them. While that issue is not relevant to the controversy before us, what is relevant, as will become evident later in this discourse, was the industry's contention that the Commissioner's delay in acting on their rate-increase requests vis-a-vis the voluntary market was denying them their constitutional right to a fair rate of return. Although they were able to charge enhanced, but allegedly insufficient, rates on the assigned-risk business, they no longer had the benefit of the now eliminated RMECs in the voluntary market and, in addition, were subject to surcharges and assessments that they could not recoup from policyholders. Nevertheless and despite the insurers' dire predictions, we concluded that their evidence of the inadequacy of rates in view of the Commissioner's ongoing consideration was then insufficient to warrant immediate relief. We noted, moreover, that at that time what was being attempted to be remedied was "a currently disastrous insurance industry situation." Id. at 389, 591 A.2d 631.
The non-automobile property and casualty insurers then entered the fray on their own behalf, raising new constitutional challenges to the assessments/loans of N.J.S.A. 17:30A-8(9) and (10), which we *749 disposed of in Matter of American Reliance Ins. Co., supra, 251 N.J.Super. 541, 598 A.2d 1219. We rejected the claim that since the property and casualty insurers did not write automobile insurance, they were denied equal protection and substantive due process by being required to contribute to the mandated loans for JUA bail-out purposes. Id. at 551-555, 598 A.2d 1219. We rejected their confiscatory-taking argument relying on State Farm, supra, 124 N.J. 32, 590 A.2d 191. Most significantly, we rejected their contract-impairment claims, which had in large part been based on N.J.S.A. 17:30A-16. That section of the PLIGA law, in its pre-FAIRA version, directed the Commissioner of Insurance to adopt rules and regulations permitting PLIGA members to "recoup over a reasonable length of time, a sum reasonably calculated to recoup assessments paid by the member insurer by way of a surcharge on premiums...." N.J.S.A. 17:30A-16. As we have noted, FAIRA, by the adoption of subsection b of N.J.S.A. 17:30A-16, prohibited recoupment by surcharge of the assessments/loans required by FAIRA, limiting that recoupment only to assessments on account of claims against insolvent insurers. We held that N.J.S.A. 17:30A-16, in its original form, had not created any contract rights which FAIRA could have impaired since that statute was always subject to change by the Legislature. Moreover, even if there was an impairment, it would have been, for the reasons stated in State Farm, supra, 124 N.J. at 64, 590 A.2d 191, a constitutionally justified impairment. Matter of American Reliance Ins. Co., supra, 251 N.J.Super. at 557, 598 A.2d 1219.
Not much more of this chapter of the story remains to be told. In Matter of Market Transition Facility, supra, 252 N.J.Super. at 267, 599 A.2d 906, it became increasingly clear that the rate structure under FAIRA, intended to keep the cost of automobile insurance reasonably affordable, was, at the same time, creating a "reasonable rate of return" problem for the insurers. Moreover the MTF was not operating, and could not operate, at its required break-even point. We ruled that the Commissioner had no authority to set MTF rates at a loss-producing level. Id. at 275-276, 599 A.2d 906. We also held that the Commissioner was obliged to take appropriate action since he "is faced not only with the possibility of creating tremendous MTF losses by permitting operations at insufficient rates, but also the possibility of creating additional losses for private insurers on voluntary business written at MTF rates for depopulated risks." Id. at 277, 599 A.2d 906. The Commissioner's response in lieu of implementing a rate increase, was to create a program of transitional assessments against automobile insurers deemed not to have written their share of MTF depopulation business, a measure that was held by the Supreme Court to be unauthorized and invalid. See Matter of Commissioner of Ins., supra, 132 N.J. 209, 624 A.2d 565.
We come now to the immediate background of this action. According to the record, by the end of the first year of its operation, MTF's operating losses amounted to 439 million dollars. In December 1993, the Commissioner issued Order A93-235, a cash-call order, requiring the automobile insurers to pay their apportioned share of that loss. Some insurers had already made full or partial payments. A number of others, however, challenged the order, and eight separate appeals were filed in this court. By way of interim relief, we stayed the order but directed the required payments to be paid into a separate Escrow Fund to be held by the State Treasurer. That directive, which effectively withheld from MTF the funds it needed to pay claims, led to the
*750 Governor's statement of imminent peril that accompanied new rules then adopted by the Commissioner which, in effect, suspended payment, with some exceptions, of all claims against the MTF. The situation was chaotic. At that point negotiations ensued between the Commissioner and the automobile insurers to resolve MTF's funding disaster, which, by 1994, had reached a deficit of 1.3 billion dollars.
A settlement agreement, to which neither PLIGA nor the non-automobile property and casualty insurers were parties, was finally reached in June 1994, disposing of all litigation and outlining a new legislative scheme for resolving the financial crisis. The basic elements of the agreement limited the insurers' surcharge liability to the 1993 cash-call order and contemplated bonding by the State to pay off the MTF deficit otherwise unaccounted for. The agreement also provided for disposition of the Escrow Fund, which by then had a balance of 197 million dollars. One hundred million dollars was to be turned over to the State Treasurer for such use by him including, but not limited to, bond financing as he would determine and the balance was to be turned over to the MTF for its use in paying claims and its other legitimate expenses. There were still, of course, the JUA debt and the PLIGA assessments to consider since, as of the date of the agreement, the eight calendar years for the assessments/loans had not yet fully expired. This is what the agreement had to say about that:
The JUA surplus will be transferred to the MTF to the extent needed by the MTF to pay liabilities and expenses. The funds which are anticipated to generate the JUA surplus will be derived primarily from FAIR Act assessments on the property and liability insurance carriers doing business in New Jersey, which include the MTF's member insurers, and shall not include any overpayments of surtaxes and assessments. Upon satisfaction and discharge of the bonds or notes as contemplated herein, the DMV Surcharges shall be available as provided by law, subject to appropriation, to repay the loans made by member insurers under N.J.S.A. 17:30A-8a(9)and (10).
The anticipated JUA surplus, estimated at 320 million dollars, a sum equivalent to two years' assessments/loans, was also to be transferred to the MTF. In sum, the MTF deficit was to be paid off roughly as follows: a bond authorization in the maximum amount of 750 million dollars to be issued by the Economic Development Authority, 200 million dollars representing the Escrow Fund, and 320 million dollars representing the last two PLIGA assessments/loans required by FAIRA.
The settlement agreement was, in effect, consummated by the adoption of GDPA in late June 1994. N.J.S.A. 34:1B-21.1 to -21.15. The annexed legislative statement of the Senate Budget and Appropriations Committee explained in part, relative to the PLIGA assessments/loans that:
The bill requires that the 1996 and 1997 insurance industry payments made under the current law through the New Jersey Property-Liability Insurance Guaranty Association for the deficit of the New Jersey Automobile Full Insurance Underwriting Association (JUA) be redirected for the purpose of paying part of the financial obligations of the MTF deficit ($320 million).

[S. No. 1250 L. 1994, c. 57.]
The substitution of MTF for JUA as the recipient of the remainder of the original eight annual assessments/loans was accomplished by the simultaneous amendment of FAIRA. As originally adopted as part of FAIRA, N.J.S.A. 17:33B-5d had dedicated funds in the Auto Fund, to which the *751 PLIGA assessments/loans were remitted, to payment of the JUA deficit. The statute further provided that "[t]hose monies are hereby appropriated for those purposes..." subject to disbursement by the State Treasurer as provided by subsection 5e, which required application by the Fund trustee and approval by the Commissioner of Insurance. N.J.S.A. 17:33B-5d. That section was amended in implementation of GDPA, not to terminate the Auto Fund but rather to permit its use, upon satisfaction of the JUA debt, for MTF financing purposes. At that same time, the DMV surcharges that had been paid into the Auto Fund would be redirected to the MTF bond financing funds, N.J.S.A. 17:29A-35b, and thereafter remitted not to the Auto Fund but to MTF financing funds, and if not needed for debt service, then, as provided by N.J.S.A. 34:1B-21.7b, to the General Fund. See N.J.S.A. 17:29A-35b, also then amended. Finally, the amendment of N.J.S.A. 17:29A-35b also provided that upon payment of the MTF financing obligations, those surcharges would be used to pay off the PLIGA assessments/loans "provided that all such payments shall be subject to and dependent upon appropriation by the State Legislature." N.J.S.A. 17:29A-35b(2).
The year 1996 was fixed by the various statutes and statutory amendments as the time when there would be enough money on deposit to pay all JUA's current and future obligations. In fact JUA's 1996 annual report so asserted, and in June 1996, the Commissioner of Insurance so certified.
Some final facts remain. First, the roughly one hundred million dollars of the Escrow Fund turned over to the Treasurer had been used as an MTF bond reserve. The State secured that sum by buying a surety bond costing three million dollars, allowing the sum of ninety-seven million dollars to be released from the reserve, which was then paid into the General Fund.
We also note that relying on the contention that the last PLIGA annual assessment/loan due in 1997 could not be collected because there was no proof the MTF needed that money to pay its debts, PLIGA sought to enjoin the Commissioner from imposing it. We rejected that contention as without merit in Matter of 1997 Assessments, 311 N.J.Super. 600, 710 A.2d 1041 (App.Div.), certif. denied, 156 N.J. 407, 719 A.2d 639 (1998), and affirmed the Commissioner's action in that regard.

II.
This action was commenced in the Chancery Division by the thirty-one plaintiffs in July 1996. They alleged constitutional defects in GDPA, namely, the impairment of contract and deprivation of equal protection and due process. They also complained of the actions of various State officials administering both FAIRA and GDPA and sought an accounting of funds they claim to have been improperly diverted to the General Fund, namely, the money whose origin was traced to the Escrow Fund. The Chancery Division ultimately transferred the action to this court pursuant to R. 1:13-4(a), viewing the gist of the complaint as a challenge to state administrative action. See R. 2:2-3(b).
While we are satisfied that the constitutional challenges belonged in the Chancery Division, nevertheless they are so entwined with the challenges to the actions of government officials as to virtually mandate integrated consideration. We are also convinced that the absence of a genuine dispute of material fact permits summary judgment dismissing the constitutional claims, even after giving plaintiffs the benefit of all legitimate inferences therefrom. See Brill v. Guardian Life Ins. *752 Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995). Since our review of a summary judgment requires us to apply the same standard to the record as governs the trial court's consideration, see, e.g., Graziano v. Grant, 326 N.J.Super. 328, 338, 741 A.2d 156 (App.Div.1999), we have opted to decide the constitutional issues on this full and complete record based on that standard. We are also satisfied that our determination of these issues mandates rejection of the challenge to administrative action as well.
These are the issues plaintiffs raise:
I. THE GOOD DRIVER PROTECTION ACT IS UNCONSTITUTIONAL AS APPLIED TO THE PLAINTIFFS BECAUSE IT VIOLATES THE CONTRACTS CLAUSES OF THE NEW JERSEY AND UNITED STATES CONSTITUTIONS.
II. DEFENDANTS' TRANSFER OF $97,050,000 EARMARKED FOR THE MTF TO THE GENERAL FUNDS WAS ILLEGAL AND SUCH TRANSFER MUST BE REVERSED.
III. COMMON LAW PRINCIPLES OF EQUITABLE ESTOPPEL AND CONSTITUTIONAL PRINCIPLES OF DUE PROCESS PREVENT DEFENDANTS FROM ASSESSING THE PLAINTIFFS TO PAY FOR THE MTF DEFICIT WHICH THEY INTENTIONALLY CREATED.
IV. HE CHALLENGED PROVISIONS OF THE GDPA AS APPLIED TO PLAINTIFFS VIOLATE THE EQUAL PROTECTION CLAUSE OF THE FEDERAL AND STATE CONSTITUTIONS.
V. DEFENDANTS ARE LIABLE FOR BREACH OF CONTRACT.
VI. THE SETTLEMENT AGREEMENT AS IMPLEMENTED THROUGH THE GDPA CONSTITUTES UNCONSTITUTIONAL SPECIAL LEGISLATION UNDER ARTICLE FOUR, SECTION 7, PARAGRAPH 8 OF THE NEW JERSEY CONSTITUTION.
We first address plaintiffs' contract-clause claims. As we understand the argument, the basis of plaintiffs' claim of unconstitutionality "as applied," rather than facial unconstitutionality, rests upon the fact that they were not parties to the settlement agreement and hence did not consent to the GDPA loan repayment scheme which deferred repayment of the PLIGA assessments until payment of the MTF bonds. Thus, what we understand them to be effectively arguing is that the deferral of repayment is a contract-clause violation as applied to them because they were entitled to receive the 97 million dollars transferred from the MTF financing fund to the general treasury, because the JUA debt was certified as satisfied in 1996, and because the MTF debt, the payment of which was the purpose of GDPA, was intentionally created by the Commissioner of Insurance. We reject all of these assertions.
First, we regard the fact that plaintiffs were not parties to the negotiations or the eventual settlement agreement that led to the GDPA as a matter of no moment in the determination of whether GDPA impairs a constitutionally protected contract or contractual relationship. That is to say, legislation ordinarily implies the unilateral imposition by the State of some obligation or responsibility upon an affected class. In that sense, plaintiffs' claims must rest, initially at least, on a facial attack such as was considered by the Supreme Court in *753 1991 in Matter of Loans, supra, 124 N.J. 69, 590 A.2d 210, and by this court in Matter of Reliance Ins. Co., supra, 251 N.J.Super. 541, 598 A.2d 1219.
To begin with, it is clear that the contract-clause argument must fail if there was never a contract at all, and we think it plain that FAIRA never conferred contract or contractual-type rights on the property and casualty insurers. That is to say, the Legislature's denomination of the eight annual assessments as a loan certainly implied that the money would eventually be repaid. But as Matter of Loans, supra, 124 N.J. at 77, 590 A.2d 210, made clear, there was never any legislative commitment respecting the terms of the repayment of the loans other than the general statement that they would be paid out of motor vehicle surcharges when the JUA debt was paid off. As the Supreme Court explained, "[t]he repayment of the PLIGA loans depends upon a number of contingencies," including whether there would be motor vehicle surcharges available after the JUA debt was discharged, whether the Commissioner of Insurance would approve application of such funds for repayment, whether the legislature would make the necessary appropriation, and whether the Treasurer would release the funds. Id. at 77, 590 A.2d 210. Moreover, the Commissioner's 1990 order, relied on by State Farm and entirely consistent with FAIRA, declared that the amount of the JUA debt and the amount of funds available to pay it were at that time too uncertain to permit any kind of payment schedule to be then formulated. Accordingly, the Commissioner, in that order, agreed that by January 1, 1996, a meeting would be held to establish a future repayment schedule. By that time, of course, GDPA had been enacted, obviating the purpose of such a meeting. It is, therefore, obvious that whether or not the property and casualty insurers were accorded a vested right to repayment by FAIRA, they had no vested right to nor any expectation as to time or any other term of repayment. GDPA continued to assure payment. It made no change in the capital contributions to the loans mandated by FAIRA. It took away nothing that plaintiffs had under FAIRA since there had never been a payment schedule that they could have reasonably relied upon.
In this regard, we reject plaintiffs' contention that FAIRA must be construed as promising them repayment when the JUA debt was paid, an actuality certified to by the Commissioner in June 1996. The flaw in that argument is that the JUA debt cannot realistically be deemed to have been paid while there remains an MTF debt. MTF and JUA are, of course, separate and discrete entities created by separate legislation, each with its own independent structure and manner of operation. Nevertheless, in every real sense, and certainly in both the functional and financial sense, MTF is the successor to JUA, and has often been so described. See, e.g., Matter of Commissioner of Ins., supra, 132 N.J. at 224, 624 A.2d 565; Matter of 1997 Assessments, supra, 311 N.J.Super. at 604, 710 A.2d 1041; Ainsworth v. State Farm Mut. Ins. Co., 284 N.J.Super. 117, 121, 663 A.2d 1365 (App.Div.1995), certif. denied, 143 N.J. 328, 670 A.2d 1068 (1996). As the transitional instrumentality created to stand in the place of the debt-ridden JUA, it inherited its functions. MTF's accumulation of deficits directly resulted from its implementation of those functions. From a technical and accounting perspective, the debts of JUA and MTF are indeed separate. From the perspective of the evolution of the legislative management of the automobile insurance crisis, they represent a continuous and integrated set of obligations.
*754 In State Farm, supra, 124 N.J. at 64-65, 590 A.2d 191, the Supreme Court, in rejecting the claim that FAIRA unconstitutionally impaired contractual rights accorded by JUA, held that the insurers, as participants in a highly regulated business, had no vested right nor contractual expectation in the indefinite continuation of the JUA scheme. Furthermore, as we held in Matter of American Reliance Ins. Co., supra, 251 N.J.Super. at 557, 598 A.2d 1219, since the JUA statutes created no contract rights, there were no contract rights for FAIRA to have impaired. The same is true in respect of FAIRA and GDPA. Any contract right vis-a-vis the PLIGA assessments/loans conferred by FAIRA was that of eventual repayment and not to any certain time or term of repayment.
There having been no such right, we see no relevancy, at least in the constitutional sense, in plaintiffs' claim that the Commissioner of Insurance intentionally created the MTF deficit by refusing to raise rates. In any event, we reject that characterization of the cause of the MTF deficit. The legislative plan in enacting FAIRA was to keep automobile insurance rates reasonably affordable for consumers, to depopulate JUA by substituting a new assigned-risk plan, to operate MTF at a break-even point, to afford the automobile insurers a reasonable rate of return, and, at the same time, to pay off the JUA's 3.3 million dollar debt. As a matter of hindsight, and perhaps as should have been anticipated, it was patently impossible for all these goals to be simultaneously achieved without a massive infusion of funds from sources outside the insurance industry, either by appropriation from the General Fund or, as GDPA eventually provided, by a public bond issue. The Commissioner of Insurance, faced with implementing the inherently irreconcilable goals of FAIRA, evidently opted to try to keep rates affordable even when faced with evidence, if indeed he was, of the mounting MTF deficit. That is hardly an intentional creation of a debt warranting the grant of judicial relief to any insurance industry participant.
Plaintiffs make much of the transfer of the 97 million dollars representing the proceeds of the Escrow Fund from an MTF reserve account to the General Fund. Their argument assumes that they had a first claim on that money and, hence, if it did not have to be used directly for MTF purposes, they were entitled to receive it in repayment of their loan contributions. That simply is not so. The scheme of the GDPA, pursuant to which the MTF bond accounts were established, was to repay the PLIGA loans when the MTF bonds were paid. We have already held that that scheme did not constitute an impairment of any repayment rights that may have been conferred by FAIRA. Clearly, then, plaintiffs have no right to any MTF-related funds until the bonds, by their own terms, are paid. The internal management of those MTF funds by State officials entrusted with their care and supervision is consequently not a matter subject to interposition by PLIGA-loan claims because those claims have not yet matured, and we find nothing in GDPA, the bond resolution or the bonds themselves interdicting the challenged transfer.
Moreover, even if GDPA did impair any contractual rights conferred on plaintiffs, we are convinced, as was the Supreme Court in State Farm, that such impairmenthere merely a delay of repaymentwould nonetheless be justified because this latest in the series of automobile-insurance legislation "addresses a significant and legitimate public purpose, imposing reasonable conditions that are related to appropriate governmental objectives." State Farm, supra, 124 N.J. at *755 64-65, 590 A.2d 191. See also Matter of American Reliance Ins. Co., supra, 251 N.J.Super. at 557, 598 A.2d 1219. The purpose GDPA was designed to address was not merely significant and legitimate. The purpose was compelling. It was no less than averting a complete collapse of the automobile-insurance system.
Plaintiffs' equal protection argument is equally unavailing. We carefully considered and rejected the equal-protection challenges made by the non-automobile insurer PLIGA members in Matter of American Reliance Ins. Co., supra, 251 N.J.Super. at 550-555, 598 A.2d 1219. Our reasoning there, in the context of JUA and FAIRA, applies fully to FAIRA and GDPA, and bears repeating:
The fact that some members of the burdened class did not directly benefit from the JUA system is not sufficient to render the classification arbitrary or unreasonable. N.J. State Bar Ass'n. v. Berman, 11 N.J.Tax 433, 447 (Tax Ct.1991). The federal and State constitutions do not require a direct correlation between the burden of taxation and benefits derived from a particular program. It has been said, albeit in a slightly different context, that "[t]he only benefit to which [a] taxpayer is constitutionally entitled is that derived from his enjoyment of living in an organized society, established and safeguarded by the devotion of taxes to public purposes." Carmichael v. Southern Coal & Coke Co., 301 U.S. 495, 522, 57 S.Ct. 868, 878, 81 L.Ed. 1245, 1261 (1937). We do not suggest that an assessment can be imposed in an irrational manner. However, in the area of economic legislation, the Legislature does not violate equal protection or due process "because the classifications made by its laws are imperfect." Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491, 501 (1970). Legislative classifications need not be made with "mathematical nicety." Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L. Ed. 369, 377 (1911). "The problems of government are practical ones and may justify, if they do not require, rough accommodations...." Metropolis Theatre Co. v. City of Chicago, 228 U.S. 61, 69-70, 33 S.Ct. 441, 443, 57 L.Ed. 730, 734 (1913). The simple and overriding fact is that all insurers benefit from a stable insurance market. Appellants cannot fairly resist payment of the assessments merely because they may not derive direct economic benefit from the manner in which they are to be usedto relieve the JUA deficit.
[Id. at 553-554, 598 A.2d 1219.]
The final argument we address is plaintiffs' contention that GDPA constitutes proscribed special legislation. The argument is without merit. Plaintiffs rely on the New Jersey constitutional provision prohibiting the Legislature from passing a private, specialor local law that, among other proscriptions, relates to taxation or exemption therefrom or to granting any individual an exclusive privilege, immunity or franchise. N.J. Const. art. IV, § 7, ¶ 9(6) and (8). They argue that GDPA violated both provisions by authorizing assessments on all PLIGA members but relieving only MTF members, i.e., the automobile insurers, from liability and permitting only them to apply for a special rate increase.
It is well settled that the determination of whether a statute constitutes general rather than special legislation depends not on what or who is included in the classification but rather on what or who is excluded. See Newark Superior Officers Ass'n v. City of Newark, 98 N.J. 212, 222-223, 486 A.2d 305 (1985); Jordan *756 v. Horsemen's Benev. & Protect. Ass'n, 90 N.J. 422, 432, 448 A.2d 462 (1982); Roe v. Kervick, 42 N.J. 191, 233, 199 A.2d 834 (1964); Harvey v. Essex Cty. Bd. of Freeholders, 30 N.J. 381, 389, 153 A.2d 10 (1959). If the classification is reasonable as measured by a legitimate legislative purpose, the statute will be deemed general if none are excluded therefrom who should be included. Vreeland v. Byrne, 72 N.J. 292, 298-301, 370 A.2d 825 (1977). Plaintiffs have not been excluded, but rather included together with all PLIGA members, those who write automobile insurance and those who do not. As we held in Matter of American Reliance Ins. Co., supra, 251 N.J.Super. 541, 598 A.2d 1219, that classification reasonably served the legislative purpose of FAIRA. It just as reasonably served the legislative purpose of GDPA, which, in effect, was to permit MTF to pay the public's claims against it by restoring it to solvency utilizing, in part, the full extent of the PLIGA assessments/loans provided for by FAIRA.
In summary, we find no constitutional defect in GDPA either facially or as applied and no improper action taken by a State official that gives plaintiffs any basis for remedial relief.
We remand to the trial court for entry of an order dismissing plaintiffs' constitutional claims, and we affirm the challenged actions of the Commissioner of Insurance and the State Treasurer and their Departments.
NOTES
[1] The Reform Act is actually a broader designation than FAIRA since the Reform Act, L. 1990, c. 8, encompasses not only N.J.S.A. 17:33B-1 to -64, but also the attendant amendments of other statutes as discussed infra.